Leo Fox, Esq.
630 Third Avenue, 18ᵗʰ Floor
New York, New York 10017
Tel. (212) 867-9595
Fax (212) 949-1857

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

**CHAPTER 11**

Case No. 09-43576 (Ess)

IN RE:

SOUTH SIDE HOUSE, LLC,

               Debtor.

-------------------------------------------------------------X

      **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

      FIRST AMENDED DEBTOR'S DISCLOSURE STATEMENT (MARCH 1, 2010)

## I.    <u>INTRODUCTION</u>

      1.     This First Amended Disclosure Statement is being filed primarily to update the Original Disclosure Statement in Light of the Debtor's Receipt recently of an Appraisal which reflects that the Real Property has a value of $29,000,000, which also is the Principal Amount due and owing under the Original Mortgage with Bank of America ("BOA"). The Plan can now articulate in greater detail the provisions for treatment of the Creditors. Briefly, since an undersecured Creditor cannot receive interest accruals during the Chapter 11 case, the approximate $1,500,000 in payments made during the Chapter 11 case as of March 2010 will have reduced all the arrears (as contended by the Debtor) of approximately $1,100,000 and will have reduced the

Principal Amount of Debt by approximately $400,000. Additionally, since the Second Mortgagee, Broadway Bank, is Unsecured, the Debtor will make monthly payments to the Unsecured Creditors from the Income of the Property. The Debtor reserves the right to "reinstate the Mortgage" under Section 1124 of the Bankruptcy Code. Finally, any Default Interest Claims or pre-payment Penalty Claims which are ultimately allowed by this Court will be paid at the rate of 10% Cash on Conformation.

2.     The above-captioned Debtor[1] submits this Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code to its known creditors in order to disclose that information deemed by the Debtor to be material, important and necessary for the Creditors and Holders of Stock Interest to arrive at a reasonably informed decision in exercising their right to vote for acceptance or rejection of the Plan of Reorganization (hereafter the "Plan"), on file with the Bankruptcy Court. Only "impaired" Creditors, as that term is defined in the Bankruptcy Code, are entitled to vote for the Plan or to reject the Plan. A full definition of what constitutes impairment is contained in Section 1124 of the Bankruptcy Code.

3.     A copy of the Plan accompanies this Disclosure Statement, as well as a Ballot Form for the acceptance or the rejection of the Plan, and a Notice and Order approving the adequacy of the information contained in the Disclosure Statement, fixing the time for filing acceptances and rejections to the Plan and for a hearing on Confirmation of the Plan.

4.     The Court has set _____ at _____ a.m. for a hearing on the acceptance or rejection and Confirmation of the Plan. Creditors who are entitled to vote may vote on the Plan by filling out and mailing, on or before _____ 2009 the accompanying Ballot to Counsel for

---

[1]     Capitalized terms used herein shall have the same meaning as defined in the Plan.

2

the Debtor, Leo Fox, Esq., 630 Third Avenue, New York, NY 10017.

5. As a Creditor, your vote is important. In order for the Plan to be deemed accepted, members of each impaired Class designated in the Plan that hold at least two-thirds (2/3) in amount and more than one-half (½) in number of the Claims of the Class that vote must vote for the Plan. A claim or interest is impaired unless the Plan: (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default; (A) cures or provides for a cure subject to Court approval of any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in Section 365 (b)(2) of this title; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (c) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

NO REPRESENTATIONS CONCERNING THE DEBTOR ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH IS OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR, WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. THE DEBTOR IS UNABLE

TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE.

APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT BY THE COURT DOES NOT CONSTITUTE A RECOMMENDATION BY THE COURT AS TO THE MERITS OF THE PLAN. THE COURT DOES NOT RENDER ANY OPINION AS TO WHETHER THE PLAN SHOULD BE ACCEPTED OR REJECTED BY CREDITORS.

CREDITORS ARE URGED TO READ THE PLAN IN FULL. THE PLAN REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT BETWEEN THE DEBTOR AND ITS CREDITORS AND SHAREHOLDERS AND INTERESTED PARTIES, AND IT SHOULD BE READ TOGETHER WITH THIS DISCLOSURE STATEMENT SO THAT AN INTELLIGENT AND INFORMED JUDGMENT CONCERNING THE PLAN CAN BE MADE.

## II.    OVERVIEW

6.      On April 30, 2009 the Debtor commenced a voluntary Chapter 11 case in the United States Bankruptcy Court for the Eastern District of New York. The Debtor continued in its business and operated as a Debtor-in-Possession  pursuant to §§1107 and 1108 of the Bankruptcy Code. No Receiver, examiner or creditor's committee had been appointed.

7.      The Debtor has been in the business of owning and operating an certain residential and commercial real estate premises located at 98-116 South Fourth Street, Brooklyn, New York, consisting of 74 rental residential units and two adjoining lots, one on each side of the residential premises consisting of two commercial units.

8.      The Debtor's principals are Israel Perlmutter, President and Max Stark, Vice President . Both individuals are extremely necessary to the operations of the business.

4

9. The filing of this Chapter 11 was caused by the downturn in the real estate market, the inability to raise cash and the need to use available cash pay certain construction companies' bills leaving the Debtor with insufficient funds, the commencement of a foreclosure action by the Bank, and the appointment of a Receiver. The Debtor was required to file a Chapter 11 Petition in order to regain possession of the premises.

10. The Debtor's Plan provides for the payment in full of all of the allowed secured claims of the mortgagee with respect to the property under a monthly payment schedule, and for the payment of monthly payments to Broadway Bank, the second mortgagee and to the unsecured creditors. The Plan may call for reinstatement of the BOA mortgage. The Plan contemplates that the Debtor will complete construction of its commercial units which will then generate additional income to be used to pay creditors. The Debtor's principals will advance or arrange to advance funds sufficient to confirm the Plan in the approximate amount of $200,000 to $300,000. The Debtor believes that this Plan is in the best interest of all creditors and will allow a greater distribution than would otherwise be available.

BACKGROUND

11. The Debtor experienced certain problems as follows. The principals of the Debtor successfully constructed and developed the Premises in 2004. The Premises are attractive, with certain of the higher floors having a waterfront view, and is located in a desirable "trendy" area in the Williamsburg section of Brooklyn. The Debtor's residential units generated collections of approximately $200,000.00 per month or a total of approximately $2,400,000.00 annually in residential rents in the recent past.

12. There are two additional adjoining parcels which are part of the tax lot consisting of

5

the residential unit building that are available for commercial leasing purposes. In or about November of 2007, the Debtor entered into a lease with Bar Celona Corp. covering a 2,000 sq. ft. space in the building adjoining the residential building with a restaurant at a rental of $7,000.00 per month. Bar Celona Corp. has moved in and is paying rent. On or about March, 2008, the Debtor entered into a lease with Myrtle Group LLC covering the 7,000 sq. ft. of commercial space on the other adjacent side of the residential unit building with a fitness gym, at a rental of $17,000.00 per month. Myrtle determined not to proceed with the Lease and the Debtor is seeking a different Tenant. The rent roll would increase to approximately $2,450,000. Both leases required the Debtor to undertake certain renovations

13.    On or about May 2007, the Debtor entered into a refinancing borrowing with UBS Real Estate Securities, now Bank of America, as Trustee, as successor in interest to LaSalle Bank National Associated under a securitized mortgage loan transaction at a 5.575% interest rate, pursuant to which the Debtor borrowed a total of $29,000,000.00 secured by a Mortgage upon the real property. The Mortgage with Bank of America includes a yield maintenance provision, a bankruptcy recourse provision, and a provision to remove the two commercial parcels adjoining the residential unit portion of the building premises from the Mortgage. The Mortgage also permits additional subordinate mezzanine borrowing.

14.    On or about December 2007, the Debtor granted a Mortgage upon the Premises, in the principal amount of $1,500,000.00 to Broadway Bank to secure certain indebtedness in the amount of $1,500,000.00. The Debtor contends that Bank of America was aware of this Subordinate Mortgage, and the Mortgage Foreclosure Action commenced by Bank of America does not even

6

allege the violation of the Broadway Bank Mortgage. This Mortgage is a Subordinate Mortgage which is subordinate to the First Mortgage held by the Bank of America.

15. As a consequence of the renovation expenses arising from the need to complete construction of the two commercial units, the Debtor was unable to pay debt service to Bank of America commencing in October 2008. The Debtor had kept Bank of America fully apprised as to the renovations and increased benefit that would inure to the Bank of America as a consequence of the completion of the renovation of the two commercial units.

16. The Schedule of Renovations is attached hereto. During this time period, the Debtor was current on all the operational expenses of the Debtor. Bank of America claimed that this failure by the Debtor should result in the Debtor's being required default amounts (beyond the contract interest and fees incurred by the bank such as servicer charges and legal fees) of nearly $7,000,000 to "compensate" the bank, without expressing any rationale, why these amounts compensate, rather than punish the Debtor.

17. The monthly Mortgage payment to Bank of America is approximately $149,000.00 (which includes real estate tax payments of approximately $9,900.00, and insurance of $4,000.00). Thus, by January 2009, the unpaid arrears were approximately $600,000.00, based on three-four months of unpaid mortgage payments. In January 2009, the Debtor offered to make double payments for the next three months which would result in the Debtor's being current on the indebtedness. However, the Bank of America rejected the proposal claiming $1.9 million in default charges. The Debtor did not have such funds available, to pay such amount and denied that the amounts were correct..

18. On or about January 30, 2009, the Bank of America commenced a Foreclosure

7

Complaint in the United States District Court for the Eastern District of New York (09-CV 0411) alleging that the Mortgage was in default and seeking a foreclosure judgment. By Memorandum Decision, dated April 24, 2009, the District Court granted a Judgment of Foreclosure.

19.     The Debtor arranged to deliver approximately $200,000.00 in residential security deposits and additional amounts representing rent proceeds to the Receiver.

20.     The Receiver's activities significantly harmed the operations of the Premises in the short time period that the Receiver has been managing the Premises.  Rent decreased and vacancies increased At the time, the Debtor was operating and managing the Premises, the Debtor's residential rent collections was approximately $204,000.00 a month and the Debtor had only one litigation with one tenant, because of the firm and polite manner that the Debtor used with respect to the tenants.

21.     The Debtor proposed to increase and enhance the income by focusing on the commercial space. The gym space is not yet completed, and will require the approximate $200,000.00 - $250,000 in renovations to complete.  (The amount includes approximately $17,000.00 in unpaid contractor work which was due when the work was stopped by the Bank of America in connection with the Foreclosure Action.) The Debtor's principals are prepared to raise such funds and complete the construction, such funds to be repaid from this excess commercial income in order to complete the renovation project, which will result in greater income for the benefit of the Bank of America, as well as the Debtor, conditioned upon the Debtor's being permitted to manage and operate the Premises for the benefit of all concerned (see below).

22.     There is no unsecured creditors' committee or other committee of creditors.

CHAPTER 11 FILING

23.     Immediately upon filing, after the BOA refused to consent to use of cash collateral,

the Debtor prepared and filed an Application for use of cash collateral and simultaneously requested that the pre-Chapter 11 Receiver turn over the Debtor's property to the Debtor pursuant to Section 543 of the Bankruptcy Code.

24.     At Hearings held on May 5, 2009 there were significant issues raised but the Hearings were adjourned for a short time. In the meantime, the Debtor prepared that same day, a short proposed Order which provided for a temporary use of cash collateral under a number of conditions which were faxed to the various participants. At a conference call held the same day, the Court heard argument and issues with respect to this form Order and ultimately entered such Order providing for a temporary use cash collateral until the final Hearing scheduled for May 21, 2009.

25.     Discovery was held with respect to the issues involved in the cash collateral. Debtor had extensive discussions during this time period BOA counsel to attempt to resolve the issues. The issues were significantly narrowed during this time period.

26.     The Debtor was presented with a very extensive objection on May 18, 2009 by BOA to the Debtor's continued use of cash collateral, largely relating to pre-petition events which BOA alleged had occurred. The Debtor made a specific response to each and every objection raised in the extensive opposition.

27.     At the Hearings held on May 21, 2009, BOA, the mortgagee and the Debtor, arrived at a negotiated settlement of a cash collateral stipulation.

28.     On July 6, 2009 the Court entered such Order authorizing use of cash collateral up until September 30, 2009.

29.     During this entire period from the first cash collateral Order the Debtor complied with all of the requirements for the use of cash collateral. The Debtor made the necessary payments and

otherwise operated in accordance with the cash collateral stipulation and order.

30.     As the September 30, 2009 deadline approached, a request was made by the Debtor pursuant to order dated October 15, 2009 the Court continued the use of cash collateral up until January 31, 2010.

## TRANSITION FROM RECEIVER AND TURNOVER

31.     At the filing, the Debtor was confronted with a Receiver and his attorney who was unwilling to abide by the determinations of the actual parties in interest and the Court on the issue of whether the Receiver would continue his duties.

32.     The Debtor prepared a provision in the initial cash collateral Order that required the Receiver to transfer the Debtor's property to the Debtor. This provision was included in the cash collateral Order that was entered on May 5, 2009. The Debtor then expended substantial time by dealing with the myriad of emergencies and issues created by a transition with the Receiver. These involved checks which had been issued by the Receiver and which were in danger of being stopped because of the filing, necessary accountings by the Receiver, issues concerning insurance, payroll, many tenant requests regarding the transition, management compensation and whole host of other issues.

33.     As the Debtor became familiar with the operations, it became quite clear that there had been significant changes generally of a detrimental kind which required the Debtor and the Debtor to expend substantial time and effort. Rentals had fallen, there were substantial number of vacancies, substantial payables and tremendous sense of dislocations among the tenants. The Debtor met or discussed these issues with the <u>Receiver</u> and coordinated the transfer of information, funds and records to the Debtor, in order for the Debtor to be able to regain control of the premises. The

Debtor ultimately recovered in excess of $140,000 from the Receiver consisting of pre-petition rents (in addition to the security deposit escrows) which the Debtor turned over to the Debtor.

34.     BOA filed a motion to Lift Stay on July 24, 2009. The Debtor reviewed the motion and had discussions with the Debtor and creditors regarding the motion. The Debtor prepared an extensive opposition to the motion setting forth substantial grounds that the motion should be denied. the Debtor reviewed a similar objection made by Broadway Bank. The Debtor appeared at the Hearings on the Lift Stay motion which was held on September 22, 2009. At the Hearings, a discovery schedule was set forth. Throughout this period, the Debtor continued to have discussions with the banks' attorneys in an effort to settle the issue of the Banks' claims. The Debtor filed additional papers regarding the motion to Lift Stay.

35.     At the Hearings on September 22, 2009 the Court reviewed the status of the matter and set forth additional schedules regarding discovery. These matters were now being fully explored in light of the Debtor's filed objections to claims, as well as the status of the ongoing payments by the Debtor to the BOA.

36.     A Status Conference Hearing date was scheduled for December 1, 2009 regarding the motion to Lift Stay.

## OBJECTIONS TO CLAIMS

37.     The Debtor had viewed the issue of the amount of the claims of the bank as being a significant issue in this case. The Debtor had requested in early May 2009, that the BOA provide a full payoff amount reflecting its claim, as part of the original cash collateral. The Debtor determined that substantial"default" amounts asserted by BOA and claims for prepayment considerations and yield maintenance would be nullified by a Plan of Reorganization (either as default amounts which are to be disallowed or as claims for unmatured interest under Section 502

11

of the Bankrutpcy Code) and would be extinguished based upon the governing law. The Debtor researched the issue.

## THE PLAN

38.   The Debtor determined that the time for the Debtor's exclusivity for filing a plan was quickly approaching and that the Debtor was not yet in a position to file a plan because of the extensive litigation and transition period. The Debtor prepared an extension motion to extend such time, scheduled for Hearing on September 22, 2009. At the Hearing on September 22, 2009 the Court extended time to file the plan to November 17, 2009.

39.   The Debtor has filed a First Amended Chapter 11 Plan on January 14, 2010. The plan contemplated that BOA as the secured creditor would be paid its secured claim under a plan which was fair and equitable or as part of a reinstatement, and that other Creditors would be paid a distribution with respect to their claims.

40.   Early in the Chapter 11 case, the Debtor entered into a Cash Collateral Stipulation with BOA and Broadway Bank, whereby the Debtor made adequate protection payments to BOA in the amount of $155,000 per month to be applied to the BOA claim. Pursuant to the Stipulation, the cash collateral payments are to be applied to the allowed claim of BOA. Now that it is clear that BOA's total claim is undersecured, BOA did not accrue any interest during the Chapter 11 claim and all payments of adequate protection are to be applied to the arrears of approximately $1,100,000. These amounts may be summarized as follows:

|  |  | AMOUNT |
|---|---|---|
| 1. | Interest 10/10/08 to 04/30/09 ............................... | $ 911,667.36 |
| 2. | Special Servicer Fee $6,000 Per Month January/09-March/10 ........................................... | $ 90,000.00 |

3. Special Servicer Advances

    a. Legal ............................... $ 53,262
    b. Environmental ................. $ 35,000
    c. Insurance .......................... $ 5,000           $ 57,262.28

               **GRAND TOTAL:**   $ 1,060,050

41.    The Debtor does not believe that the claims by BOA for Default Interest, Prepayment Consideration and Yield Maintenance may be collected from the Debtor. These amounts total approximately $7,000,000. These claims are punitive, deprive legitimate Creditors of any entitlement for payment on their legitimate claims and in the case of Yield Maintenance are clearly proscribed by Section 502 (b) (2) of the Bankruptcy Code, as a claim for unmatured interest, both by definition as well as how such claim is calculated. Furthermore, allowing Yield Maintenance would result in a windfall to BOA at the expense of creditors. The Debtor shall provide additional authority for these Statements prior to the Hearings on Confirmation.

42.    The Debtor's counsel has discussed potential settlement with BOA's counsel and have determined to enter into a series of serious negotiations with BOA concerning the distributions to be made under the Plan. The Debtor believes that BOA will accept the treatment to be made to BOA under the Plan and to vote in favor of the Plan.

## VI.   DEBTOR'S OPERATIONS

43.    During the Chapter 11 case, the Debtor has received rent income receipts in the approximate amount of $1,521,219. as of November 30, 2010. The Debtor generated profits based on the monthly operating reports.

## VII. SOURCE OF FUNDS FOR PLAN

44. The Debtor will have obtained the necessary funds for Confirmation from operations of the Debtor and third-party funds.

45. To summarize in Tabular Form:

### FUNDS NECESSARY FOR CONFIRMATION OF PLAN:

|  | | UNPAID ESTIMATED FEES ACCRUED THROUGH CONFIRMATION |
|---|---|---|
| (1) | Leo Fox, Esq. Counsel to Debtor: [2] | $ 150,000 |
| (2) | General unsecured claims (approximately $1,700,000 assuming that BOA has no Unsecured Claims. | $ -0- |
| (3) | Payments to BOA ($200,000) plus cost of construction of the Commercial Units of $250,000. | $ 450,000 |
| **FUNDS NEEDED FOR CONFIRMATION:** | | $ 600,000 |

Source of Funds:

| (1) | Debtor's funds | $ 250,000 |
|---|---|---|
| (2) | Contributions from Debtor's principals: | $ 200,000 |
| (3) | Suspense Funds | $ 150,000 |
| | **TOTAL SOURCES ◄** | $ 600,000 |

---

[2] Assumes balances owed on Bills are granted and paid from Debtor's available funds. These professionals may negotiate a payment schedule with the Debtor if necessary.

14

## VII.  SUMMARY OF PLAN

46.    The Plan is composed of 3 Classes of Creditors and one Class of Equity Holders. Only Class 4 representing the Stock Holder Interest of the Debtor, which include Stock Holder interests owned by Israel Perlmutter and Max Stark consists of "insiders" of the Debtor as defined under the Bankruptcy Code.  Class 2 representing Unsecured Creditors constitute a Class because the recent Appraisal reflects that the value of the Real Property is less than the total of the claims of BOA, Broadway Bank and the Contractors.

## CLASS 1

47.    Bank of America as Trustee.  The allowed Class 1 claims of $29,000,000 less adequate protection payments made against such Principle, shall be paid in full, commencing upon the Effective Date at an interest rate of 5.575% per annum (the Pre-petition Rate by monthly installment payments of (a) the Fixed Monthly Payments continuing up until the Maturity Date plus (b) a payment of $200,000.00, paid on the Effective Date and (c) a balloon payment at the Maturity Date of the then principal balance of the Allowed Claim, plus all accrued interest and other charges accrued under the loan documents, accrued post-confirmation, as Allowed by this Court.  All payments shall first be applied to interest, other fees allowed by the Court and then to Principle.  The Court shall determine the amount of the Allowed claim, and if appropriate, the amount of the Allowed Secured claim and Allowed Unsecured claim of such creditor.  Any allowed unsecured claim shall be paid as an unsecured creditor in Class 2.

48.    This creditor shall release approximately $150,00 in suspense funds belonging to the Debtor, which such creditor is holding, to the Debtor as and when the construction of the two commercial units recommences, towards the payment of the cost of the construction, upon request

15

of the Debtor and submission of the underlying bills of such construction.

## REINSTATEMENT OPTION

49.    The Debtor has the option by announcement at the Hearings on Confirmation or any adjourned date thereof, at its sole discretion, to reinstate the loan documents pursuant to Section 1124 of the Bankruptcy Code, in the event that (a) this creditor votes to reject the plan, or (b) the Allowed Secured claim of this creditor is greater than $29 million dollars or (c) the Allowed unsecured claim of this creditor is greater than $700,000.

50.    The Reinstated Loan Balance shall be paid in full, commencing upon the Effective Date at an interest rate of 5.575% per annum by the payment of the Fixed Monthly Payments continuing up through the Maturity Date, with payment of the arrears as set forth below.

51.    The Court shall determine the amount of the Arrears, representing the additional amounts which must be paid by the Debtor in addition to $29,000,000, in order to effect a cure of the Class 1 Mortgage under Section 1124 of the Bankruptcy Code.  The Arrears shall be "capitalized" and shall accrue interest at the rate of 4% per annum commencing on the Effective Date, and shall be payable on an installment monthly basis commencing at the Effective Date, at $9,000 per month until the Arrears are paid in full or until the Maturity Date (and then to be paid in full).

52.    Once the Arrears are fully paid and all monetary payments otherwise due at that point in time having been made to this creditor, this creditor shall deliver releases of its mortgages on the Real Property, underlying the two commercial units at the Real Property, as provided in the mortgage, upon written request of the Debtor.

53.    In the event of a controversy as to whether any Class is impaired, the Court shall, after notice and a hearing, adjudicate such controversy.  This Class is not impaired if reinstated and may

16

not vote on the Plan, but will vote if the Class is not reinstated.

**CLASS 2**

54.    Class 2 - consist of all Allowed Unsecured, including the Claims of Broadway Bank, any deficiency claims of BOA for ordinary contract rate interest, and the Contractors for $17,000. Class 2 shall not consist of any Allowed claims of BOA which the Debtor seeks to have subordinated and placed into Class 3 (Yield Maintenance, Prepayment Consideration and Default Interest). Payment shall be made on account of the Allowed Unsecured Claims of Class 2 as follows: The creditors shall be paid the balance of all income, after payment of the expenses of the operation of the Debtor, including Management Fees of 5% and first Mortgage Payments to BOA payable on a quarterly basis pro rata to all such Creditors, without interest. The distribution payment shall be accompanied by a verified statement from the Debtor indicating the basis for the distribution. The Debtor shall be entitled to retain $200,000. in its accounts before making payment to the Unsecured Creditors. These payments shall continue until the Maturity Date, in full satisfaction of all such Claims. The Debtor shall be entitled to withdraw 25% of net income once the Unsecured Creditors have received 65% of their Claims. This Class is impaired and will vote on the Plan.

**CLASS 3**

55.    Class 3: Unsecured Creditors in Class 3 consist of Allowed Claims which this Court determines should be allowed after a Hearing on Notice before this Court on Objection (which the Debtor has indicated it will be objecting to pursuant to Sections 105, 502, 507 of the Bankruptcy Code) of BOA relating to Pre-payment consideration or Yield Maintenance in the sum of $5,954,395 and Default Interest of $813,611. This Class, to the extent that all or any such portions are allowed, shall be subordinated to the Claims of the General Unsecured Creditors pursuant to Section 510 of the Bankruptcy Code on the grounds that such claims are non-compensatory, punitive and unduly

17

interfers in the rightful distribution that General Unsecured Creditors holding claims for Principle and Ordinary Contract Rate Interest should be entitled to. Class 3 shall receive a 10% distribution payable in cash on the Effective Date, payable by the Equity Holders of the Debtor from non-Debtor Funds in full satisfaction of such claims. This Class is impaired and shall vote on the Plan.

## CLASS 4

56.    Class 4: The Equity Interests of the Debtor shall contribute up to $200,000, plus 10% of the Allowed Claims of Class 3, which sums are to be used to confirm the Chapter 11 Plan, as set forth above. Such Class shall arrange for the payment of the sums necessary to complete the construction of the Commercial Unit at the Real Property. Such Class shall retain its Equity Interest in consideration for the payments described herein. This Class is impaired and is posting new value and will vote on the Plan.

57.    Section 1129 (b) of the Bankruptcy Code provides generally that where unsecured creditors are not being paid in full, as is the case here, the Stock Holder may not retain their Stock Interests in the Debtor unless the unsecured creditors have voted for the Plan. This rule, also known as the Absolute Priority Rule, has an exception which has been recognized by many Courts, which is known as the "new value exception," pursuant to which the Stock Holders may retain their interest if sufficient "new value" is contributed by the Stock Holders. The New Value Exception to this Rule has been recognized in the Eastern District of New York see In Re 8315 Fourth Avenue Corp.172 B.R. 725, 737-39 (Bkrtcy E.D.N.Y. 1994). Messrs. Perlmutter and Stark's contribution of substantial funds at confirmation represents "new value" on behalf of all of the shareholders of the Debtor. In the event the unsecured creditors do not vote for the Plan, and the Court does not recognize the "new value" exception, it is possible that the Chapter 11 Plan may not be confirmed.

# ARTICLE V
## ADMINISTRATION EXPENSES AND UNCLASSIFIED CLAIMS

58.    Chapter 11 administration creditors, include the attorneys and accountants for the Debtor who have rendered services and who are entitled to compensation under Sections 327 and 503(b) of the Bankruptcy Code, and the fees payable to the Office of the United States Trustee under 28 U.S.C. 1930 are not classified and shall be paid in full on the Effective Date. All of the within claims may be paid under a different agreement reached with the Debtor prior to confirmation.

59.    Unless otherwise provided for in the Confirmation Order or other award of the Court, fees and expenses incurred for services after the Confirmation Date to the Debtor or the Committee by one or more professionals retained in these proceedings in furtherance of carrying out the terms and conditions of this Plan shall be paid as provided herein. A written invoice or statement accompanied by supporting time records and an itemization of time records shall be submitted to (1) attorneys for the Debtor and (2) the Debtor. All monthly bills shall be paid by the Debtor within 20 business days on account thereof unless the Debtor notifies the professional in writing of the objection thereto within this period of time. This objection shall also be served on counsel for the Debtor. In the event that such objections cannot be resolved consensually any fees requested in excess of the amount stated above or which an objection is raised shall be resolved at a hearing before the Bankruptcy Court who is in the best position to determine the dispute regarding the payment of such fees.

## UNITED STATES TRUSTEES FEES UNDER 28 U.S.C. 1930

60.    The Debtor will assure and be responsible for all payments due to the United States Trustee's office up through confirmation, and thereafter up through the closing of the case. These

payments shall be paid timely. All United States Trustees fees accrued prior to confirmation shall be paid at or prior to confirmation. All subsequent United States Trustee fees shall be timely paid by the Debtor.

## IX.   THE REORGANIZED DEBTOR

61.    At Confirmation, the Debtor will have achieved a reorganization involving the various claims of all the creditors. The Reorganized Debtor shall continue to maintain ownership of its business.  Annexed hereto is a pro forma Confirmation balance sheet (Exhibit "A"). Furthermore, the Debtor will be able to continue to make the payments required under the Plan (as confirmed by the Debtor's projections, annexed hereto as Exhibit "B"). The Reorganized Debtor shall provide by amendment a provision in its Charter that prohibits the issuance of any non-voting equity interests. The provisions of New York Corporation Law and Limited Liability Company Law shall govern the election and selection of any officer and director of the Debtor, and any successor thereof. The Debtor shall continue to maintain a Lock Box Account which will provide for BOA to be able to view the account and receive Wire Transfer of the Monthly Payments due to BOA. The Broadway Bank Mortgage shall be cancelled as representing an Unsecured Claim.

## X.   OFFICERS AND DIRECTORS AND MEMBERS

62.    On Confirmation, Israel Perlmutter shall continue to act as President and conduct the Debtor's financial affairs without salary and Max Stark shall continue to act as Vice President without salary.

63.    In all other respects, the corporate existence of the Debtor corporation shall continue unabated, including the corporate charter, the bylaws and other corporate documents.

20

## XI. THE LIQUIDATION ANALYSIS

64.      The Debtor believes that the only alternative to confirming this Chapter 11 Plan is a conversion of this case to a case under Chapter 7 of the Bankruptcy Code. Annexed hereto as Exhibit "C" is a Liquidation Analysis of the Debtor's assets, prepared by the Debtor. The analysis represents the Debtor's effort to estimate the results of an immediate liquidation on or about the date of Confirmation, calculated to be some time in the Spring of 2010.

65.      The Liquidation Analysis assumes that the liquidation sale of the Debtor's assets would result in net proceeds which would be insufficient to pay the secured claims of the Chapter 11 administration expenses, the Chapter 7 administration expenses and BOA, leaving the junior secured creditors with little or no distribution.

66.      The Debtor believes that the Debtor will be able to establish, under the terms of this Plan, that it has met one of the requirements to confirm a Plan, which is that the treatment under the Plan provides creditors with better treatment than such creditors would receive in liquidation.

## XII. EXECUTORY CONTRACTS

67.      The Debtor shall reject any remaining executory contracts on Confirmation, other than the leases and executory contracts being specifically assumed or otherwise dealt with during this Chapter 11 case and as set forth herein. Persons holding claims as a result of the rejection of any lease or executory agreement may file a claim with the Bankruptcy Court within thirty days of the rejection.

## XIII. TAX IMPLICATIONS

68.      The Debtor is not aware of any significant tax implication which would inure to the Debtor as a result of the filing and confirming of this Plan of Reorganization other than as stated

herein. The Debtor suggests that creditors consult their tax advisors with respect to the implication of the Plan and the Confirmation upon such creditors.

## XIV. PREFERENCE AND FRAUDULENT CONVEYANCE ACTIONS

69. The Debtor having reviewed its books and records has investigated whether there are any valid causes of action, including proceedings to avoid transfers including, but not limited to, proceedings under 11 U.S.C. 544(b), 547, 548, 549, 550 or applicable State Law. After analyzing the risks and expenses related to the prosecution of and the limited recovery if any which would enure to the benefit of the creditors in the event that the Debtor would be successful, and the ability to collect on any judgments obtained and the Debtor does not intend to institute any causes of action for preference or fraudulent conveyance.

## XVI. RETENTION OF JURISDICTION BY THE COURT

70. The Plan provides that the Court shall retain jurisdiction for specified purposes, including without limitation, the determination of all controversies arising under or in regard to the Plan, objections to claims, hearing and determining applications for allowances of compensation and reimbursement of expenses, and the enforcement or continuation of orders entered in this case, until substantial Consummation, and closing of the case.

## XVII. EFFECTS OF COURT'S CONFIRMATION AND FEASIBILITY OF THE PLAN

71. Pursuant to Section 1141(d) of the Bankruptcy Code, the Confirmation Order shall discharge claims against the Debtor. Except as expressly provided herein, the rights afforded in the Plan and the treatment of all Creditors and holders of Stock Interest provided herein shall be in exchange for and in complete satisfaction, discharge and release of all Claims arising of out the transaction involving this Debtor, as of the Confirmation Date, of any nature whatsoever, whether known or unknown, contingent or liquidated including any interest accrued or expenses incurred

thereon from and after the Debtor's Petition Date, against the Debtor and the Debtor-in-Possession (or any of its properties or interest in properties), the Officers and Directors of the Debtor and the Professionals representing the Debtor (arising out of services in connection with this Chapter 11 case) in this Chapter 11 case (excluding negligence acts of wilful misconduct ultra virus acts and breach of fiduciary duty by such professionals). Except as otherwise provided in the Plan, upon the Confirmation Date, all Claims against the Debtor and the above referred to professionals will be satisfied, discharged and released(except for those obligations identified in the Plan) in full exchange for the consideration provided for hereunder. All persons and entities shall be precluded from asserting against the Debtor, its successors, its respective assets or properties and the above referenced persons and professionals, any of the above Claims that occurred prior to the Confirmation Date. Nothing herein shall discharge any claim for fraud or gross negligence against a professional.

## XVIII.   INJUNCTION

72.     Except as otherwise provided in the Plan or Confirmation Order on and after the Confirmation Date, all entities which have held, currently hold or may hold a debt, claim, other liability of interest against the Debtor that would be discharged upon Confirmation of this Plan, pursuant to the provisions of Section 1141(d) of the Bankruptcy Code and this Section, are permanently enjoined from taking any of the following actions on account of such debt, claim, liability, interest or right: (a) commencing or continuing in any manner any action or other proceeding on account of such claim against property which is to be distributed under this Plan, other than to enforce any right to distribution with respect to such property under the Plan; (b) enforcing, attaching collecting or recovering in any manner or judgment, award, decree, order other than as permitted under Sub-paragraph (a) above; and (c) collection efforts against, creating, perfecting or

23

enforcing any lien or encumbrance against any property to be distributed under this Plan.

73. The effects of Confirmation of the Plan are set forth in the Bankruptcy Code. The following is a brief summary of the effect of Confirmation upon the Debtor, its creditors and other interested parties. Upon Confirmation, the provisions of the Plan will bind the Debtor, its equity holders and creditors, whether or not they have accepted the Plan. All liens and claims are canceled and extinguished unless dealt with differently in the Plan. Satisfaction of the Debtor's pre-Chapter 11 debts and those incurred subsequently to the commencement of this case all are governed by the Plan.

74. The Debtor believes that the Plan is feasible and that Confirmation is not likely to be followed by liquidation or the need for further financial reorganization.

## XIX. ANTICIPATED CONFIRMATION DATE

75. It is anticipated the Plan will be confirmed by the Bankruptcy Court within forty (40) days, assuming the following events take place:

        A.    The Plan is duly accepted by creditors;

        B.    The Bankruptcy Court finds that the Plan is feasible and in the best interests of creditors; and

        C.    The Court finds that the Plan is fair and equitable and does not discriminate unfairly.

        D.    The Debtor has made arrangement with the professionals for the payment of these professional fees.

## XX. WHERE TO FILE BALLOTS ON THE PLAN

76. Pursuant to a Court Order approving this Disclosure Statement, ballots on the Debtor's Plan must be received by _____, 2010. All ballots should be properly completed and forwarded to: "Leo Fox, Esq., 630 Third Avenue, 18th Floor, New York, New York 10017".

Dated: New York, New York
March 1, 2010

**SOUTHSIDE HOUSE, LLC**

By: /s/ _____

/s/ _____
**LEO FOX, ESQ. (LF-1947)**
Attorney for Debtor
and Debtor-in-Possession
630 Third Avenue
New York, New York 10017
(212) 867-9595

Leo Fox, Esq.
Attorney for Debtor
630 Third Avenue, 18th Floor
New York, New York 10017
(212) 867-9595

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
IN RE:

SOUTH SIDE HOUSE, LLC,

                     Debtor.
-----------------------------------------------------------------X

Chapter 11
Case No. 09-43576 (Ess)


**FIRST AMENDED CHAPTER 11
PLAN OF REORGANIZATION
MARCH 1, 2010**

      The above captioned Debtor and Debtor-In-Possession proposes this first Plan of Reorganization pursuant to Section 1121 of the Bankruptcy Code.

### ARTICLE I
### DEFINITIONS

      **1.1**    All terms used in this Plan, unless the context otherwise requires, are as defined in Title 11 of the United States Code. The following terms have the meaning set forth in this Article I.

| | |
|---|---|
| "Administrative Claim" | Means Allowed claims or requests for payment under Section 503(b) entitled to priority under Section 507(a)(2) of the Bankruptcy Code. Administrative expenses approved by the Court pursuant to Code Sections 503(b), and United States Trustee fees under 28 U.S.C. § 1930 (United States Trustee fees are not required to have been filed as a request for payment). |
| "Allowed" | Means: (a) with respect to an Administrative Claim of the kind described in Section 503(b), (2), (3), (4) or (5) of the Bankruptcy Code, an Administrative Claim that has been Allowed, in whole or in part, by a Final Order; (b) with respect to any other Administrative Claim, |

including an Administrative Claim of the kind described in Section 503(b) an Administrative Claim as to which no objection has been filed; (c) with respect to any Claim that is not an Administrative Claim, a Claim that is either (I) listed on the Schedules or (ii) is not a Disputed Claim or (iii) has been allowed by a Final Order; or (d) with respect to any Equity Security Interest, an Equity Security Interest that is not Disputed, or has been allowed in whole or in part by a Final Order.

"Bankruptcy Code"

Title 11 of the United States Code, Sections 101, et seq. or as amended thereafter in effect as of the Filing Date.

"Chapter 11 Case"

Means the Chapter 11 Case (No. 09-43576 (ESS) commenced by the Debtor on the Filing Date.

"Claim"

Means a Claim, as defined in Section 101(5) of the Bankruptcy Code, against the Debtor including, without limitation, claims allowable under Section 502 of the Bankruptcy Code or requests for payment of administrative expenses allowed under Section 503 of the Bankruptcy Code.

"Claimant" or "Creditor"

Means the holder of a Claim, including the holder of a claim for damages resulting from the rejection of an unexpired executory contract or lease.

"Closing Expenses"

Means such fees and expenses as may be required to close the Chapter 11 Case under applicable law, including, but not limited to, all applicable fees )including without limitation, United States Trustee Quarterly Fees), taxes, and reasonable attorneys and accounting compensation and reimbursements that may be associated therewith.

"Confirmation Date"

The date on which an Order confirming this Plan is entered by the Court, provided that such Order has not been stayed.

| | |
|---|---|
| "Court" | The United States Bankruptcy Court for the Eastern District of New York, or such other court as may from time to time have original jurisdiction over these Chapter 11 proceedings. |
| "Debtor" | South Side House, LLC |
| "Disallowed Claim" | Means any Claim or portion thereof that is determined in a Final Order of the Court not to be allowed pursuant to Section 502 and 503 of the Bankruptcy Code. |
| "Disclosure Statement" | Means any disclosure statement required by §1125 of the Bankruptcy Code, and approved by the Court. |
| "Disputed" | Means, (a) with respect to any Claim other than an Administrative Claim, a Claim (I) that would be deemed filed pursuant to Section 1111(a) of the Bankruptcy Code but as to which (A) a proof of claim has been timely filed that is inconsistent in any way with the description or treatment of such Claim in the Schedules, or (B) as to which an objection has been filed, or (ii) that would not be deemed filed pursuant to Section 111(a) of the Bankruptcy Code, whether by reason of its exclusion from the Schedules or its description therein as disputed, contingent or unliquidated, but as to which a proof of claim has been filed; or (b) with respect to an Administrative Claim, an Administrative Claim as to which an objection has been filed. |
| "Distribution" | Means a distribution of Cash or Cash equivalents to the holders of Allowed Claims under the Plan. |
| "Effective Date" | Shall be a date which is thirty days after the Confirmation Date. |
| "Estate" | Means the estate created in this Case pursuant to Section 541 of the Code. |

| | |
|---|---|
| "Excess Cash Flow" | <u>All sums remaining in the Lock Box Account beyond $200,000, after payment of all expenses and post reorganization payments to creditors which shall be paid to Creditors.</u> |
| "Filing Date" | Means April 30, 2009. |
| "Final Distribution" | Means the date on which all initial Distributions provided for under this Plan have been mailed or otherwise issued to holders of all Allowed Claims. |
| "Final Order" | An order of a court from which no appeal or review can be taken, or as to which all appeals and reviews have been withdrawn or dismissed with prejudice. |
| "Fixed Monthly Payments" | Means the present monthly interest only payment only due on the first mortgage and note on the Real Property in the amount of approximately $134,000. |
| "Maturity Date" | The date of May 10, 2017, which is the Maturity Date of the interest only First Mortgage under the First documents |
| "Plan" | Debtor's Plan of Reorganization or as modified in accordance with the Bankruptcy Code. |
| "Real Property" | The Debtor's real estate and associated rights located at 98-16 South 4th Street, Brooklyn New York 11211, improvements, furnishings, and fixtures located thereon. |

## ARTICLE II

## DESIGNATION OF CLAIMS AND INTEREST

**2.1** **Class 1:** The Allowed Secured Claim of Bank of America as Trustee holding a first mortgage on the Real Property with respect to its claims.

**2.2** **Class 2:** The Allowed Unsecured claims of the Unsecured Creditors, consisting of primarily of the Claims of Broadway Bank holding a second mortgage on the Real Property with respect to its claims, which is totally unsecured including interest and fees.

**2.3** **Class 3:** Any allowed claims of BOA for Defaut Interest, Pre-payment Penalties or consideration and Yield Maintenance.

**2.4** **Class 4:** The equity interest of the Debtor held by Max Stark and Isreal Perlmutter.

**ANY HOLDER OF A CLAIM OR INTEREST IN ANY OF THE ABOVE CLASSES WHO FAILS TO OBJECT IN WRITING TO THE CLASSIFICATION PROVIDED IN THE PLAN AT LEAST FIVE (5) DAYS PRIOR TO THE HEARING ON DISCLOSURE STATEMENT SHALL BE DEEMED TO HAVE ACCEPTED SUCH CLASSIFICATION AND TO BE BOUND THEREBY. ANY BALLOT WHICH IS EXECUTED BY A HOLDER OF AN ALLOWED CLAIM WHICH DOES NOT INDICATE ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED AN ACCEPTANCE OF THE PLAN. ANY CLASS THAT HAS VOTED TO ACCEPT TREATMENT UNDER THIS PLAN SHALL BE DEEMED TO ACCEPT A MORE FAVORABLE TREATMENT, WITHOUT THE NEED FOR ADDITIONAL DISCLOSURE, UNDER AN AMENDED PLAN FILED BY THE DEBTOR. SUCH AMENDED PLAN MAY BE FILED AT ANY TIME PRIOR TO OR AT CONFIRMATION.**

# ARTICLE III & IV

## CLAIMS IMPAIRED UNDER THE PLAN (AND UNIMPAIRED)

### A) Non-Reinstatement of Claim Provisions

**CLASS 1**

3.1     Bank of America as Trustee. The allowed Class 1 claims of $29,000,000. less adequate protection payments made against such Principle, shall be paid in full, commencing upon the Effective Date at an interest rate of 5.575% per annum (the Pre-petition Rate by monthly installment payments of (a) the Fixed Monthly Payments continuing up until the Maturity Date plus (b) a payment of $200,000.00, paid on the Effective Date and (c) a balloon payment at the Maturity Date of the then principal balance of the Allowed Claim, plus all accrued interest and other charges accrued under the loan documents, accrued post-confirmation, as Allowed by this Court. All payments shall first be applied to interest, other fees allowed by the Court and then to Principle. The Court shall determine the amount of the Allowed claim, and if appropriate, the amount of the Allowed Secured claim and Allowed Unsecured claim of such creditor. Any allowed unsecured claim shall be paid as an unsecured creditor in Class 2.

3.2     This creditor shall release approximately $150,00 in suspense funds belonging to the Debtor, which such creditor is holding, to the Debtor as and when the construction of the two commercial units recommences, towards the payment of the cost of the construction, upon request of the Debtor and submission of the underlying bills of such construction.

### REINSTATEMENT OPTION (NON-IMPAIRMENT

3.3     The Debtor has the option by announcement at the Hearings on Confirmation or any adjourned date thereof, at its sole discretion, to reinstate the loan documents pursuant to Section 1124 of the Bankruptcy Code, in the event that (a) this creditor votes to reject the plan, or (b) the

Allowed Secured claim of this creditor is greater than $29 million dollars or (c) the Allowed unsecured claim of this creditor is greater than $700,000.

3.4    The Reinstated Loan Balance shall be paid in full, commencing upon the Effective Date at an interest rate of 5.575% per annum by the payment of the Fixed Monthly Payments continuing up through the Maturity Date, with payment of the arrears as set forth below.

3.5    The Court shall determine the amount of the Arrears, representing the additional amounts which must be paid by the Debtor in addition to $29,000,000, in order to effect a cure of the Class 1 Mortgage under Section 1124 of the Bankruptcy Code. The Arrears shall be "capitalized" and shall accrue interest at the rate of 4% per annum commencing on the Effective Date, and shall be payable on an installment monthly basis commencing at the Effective Date, at $9,000 per month until the Arrears are paid in full or until the Maturity Date (and then to be paid in full).

3.6    Once the Arrears are fully paid and all monetary payments otherwise due at that point in time having been made to this creditor, this creditor shall deliver releases of its mortgages on the Real Property, underlying the two commercial units at the Real Property, as provided in the mortgage, upon written request of the Debtor.

3.7    In the event of a controversy as to whether any Class is impaired, the Court shall, after notice and a hearing, adjudicate such controversy. This Class is not impaired if reinstated and may not vote on the Plan, but will vote if the Class is not reinstated.

CLASS 2

3.8    Class 2: - consist of all Allowed Unsecured, including the Claims of Broadway Bank, any deficiency claims of BOA for ordinary contract rate interest, and the Contractors for $17,000. Class 2 shall not consist of any Allowed claims of BOA which the Debtor seeks to have subordinated

and placed into Class 3 (Yield Maintenance, Prepayment Consideration and Default Interest). Payment shall be made on account of the Allowed Unsecured Claims of Class 2 as follows: The creditors shall be paid the balance of all income, after payment of the expenses of the operation of the Debtor, including Management Fees of 5% and first Mortgage Payments to BOA payable on a quarterly basis pro rata to all such Creditors, without interest.. The Debtor shall be entitled to retain $200,000 in its accounts before making payment to the Unsecured Creditors. These payments shall continue until the Maturity Date, in full satisfaction of all such Claims. The Debtor shall be entitled to withdraw 25% of net income once the Unsecured Creditors have received 65% of their Claims. This Class is impaired and will vote on the Plan.

**CLASS 3**

**3.9** **Class 3**: Unsecured Creditors in Class 3 consist of Allowed Claims which this Court determines should be allowed after a Hearing on Notice before this Court on Objection (which the Debtor has indicated it will be objecting to pursuant to Sections 105, 502, 507 of the Bankruptcy Code) of BOA relating to Pre-payment consideration or Yield Maintenance in the sum of $5,954,395 and Default Interest of $813,611. This Class, to the extent that all or any such portions are allowed, shall be subordinated to the Claims of the General Unsecured Creditors pursuant to Section 510 of the Bankruptcy Code on the grounds that such claims are non-compensatory, punitive and unduly interfers in the rightful distribution that General Unsecured Creditors holding claims for Principle and Ordinary Contract Rate Interest should be entitled to. Class 3 shall receive a 10% distribution payable in cash on the Effective Date, payable by the Equity Holders of the Debtor from non-Debtor Funds in full satisfaction of such claims. This Class is impaired and shall vote on the Plan.

**CLASS 4**

**3.10    Class 4:** The Equity Interests of the Debtor shall contribute up to $200,000, plus 10% of the Allowed Claims of Class 3, which sums are to be used to confirm the Chapter 11 Plan, as set forth above. Such Class shall arrange for the payment of the sums necessary to complete the construction of the Commercial Unit at the Real Property. Such Class shall retain its Equity Interest in consideration for the payments described herein. This Class is impaired and is posting new value and will vote on the Plan.

## ARTICLE V

## ADMINISTRATION EXPENSES AND UNCLASSIFIED CLAIMS

**5.1**    Chapter 11 administration creditors, include the attorneys and accountants for the Debtor who have rendered services and who are entitled to compensation under Sections 327 and 503(b) of the Bankruptcy Code, and the fees payable to the Office of the United States Trustee under 28 U.S.C. 1930 are not classified and shall be paid in full on the Effective Date, and shall accrue and continue to be paid up through the closing date of this Chapter 11 case. All of the within claims may be paid under a different agreement reached with the Debtor prior to confirmation.

## ARTICLE VI

## MEANS FOR EXECUTION OF PLAN

**6.1**    The Debtor shall arrange to complete the construction of the two commercial units at the Real Property, at the expense of the Debtor's Equity Holders, and with the use of any Escrow funds being held by the Class 1 creditor. The Debtor shall arrange to lease the commerical units as soon as practicable. The Debtor will arrange for the management and operation of the Real Property, and may retain an internal managing agent (which may be an entity owned or manageds by the Debtor's equity holders) which may be paid the normal customary fee of 5% of receipts and customary fees for any lease renewals.

**6.2**    Fee Applications, if any, shall be filed on notice to creditors.

## ARTICLE VII

### PROCEDURES FOR RESOLVING DISPUTED CLAIMS

**7.1**    Time Limit for Objections to Claims.  Objections to Claims shall be filed by the Debtor with the Court and served upon each holder of each of the Claims to which objections are made not later than thirty (30) days subsequent to the Confirmation Date or within such other time period as may be fixed by the Court. Unless  otherwise extended by Order of the Court, the Debtor may file an objection to the allowance of any Claim filed resulting from the rejection of an executory contract on the later of thirty (30) days following the Confirmation Date or within thirty (30) days after the filing of such Claim and service of a copy of such Claim upon the Debtor as provided for in the Plan.

**7.2**    Resolution of Disputed Claims.  Unless otherwise ordered by the Court, the Debtor shall litigate to judgment, settle or withdraw objections to Disputed Claims, in its sole discretion, without notice to any party in interest, other than notice of not less than ten (10) days notice, as between the Debtor.

**7.3**    Payments.  Payments and distributions to each holder of a Disputed Claim that ultimately becomes an Allowed Claim shall be made in accordance with the provisions of the Plan with respect to the Class of Creditors to which the respective holder of an Allowed Claim belongs. Such payments and distributions shall be made as soon as practicable after the date that the Court enters a Final Order allowing such Claim, but not later than thirty (30) days thereafter.  Payments shall be made as and when a Disputed Claim has become, in whole or in part, an Allowed Claim or a Disallowed Claim, pursuant to a Final Order or agreement between the Debtor and such Claimant or as Allowed by this plan.

## ARTICLE VIII

## THE REORGANIZED DEBTOR

**8.1** The reorganized Debtor shall continued to operate and conduct its affairs, with its present management, officers and directors (Messrs Stark and Permutter). The Debtor may retain an internal managing agent at a normal and customary managing fee, of 5%. The Debtor shall continue to maintain a lock box account which will provide BOA to be able to review the Account and receive Wire Transfers of the Monthly Payments due to BOA. The Broadway Bank Mortgage shall be cancelled as representing an unsecured claim. The Debtor shall provide Monthly Operating Reports to BOA after Confirmation.

## ARTICLE IX

## EXECUTORY CONTRACTS

**9.1** The Debtor hereby rejects all contracts as of the Petition Date, except as otherwise provided herein. Persons holding claims as a result of the rejection of an executory contract may file claims with the Bankruptcy Court within thirty (30) days of the Confirmation.

## ARTICLE X

## MODIFICATION OF PLAN

**10.1** The Debtor may amend and modify this Plan at any time prior to the Confirmation Order, without approval of the Court; after Confirmation, the Debtor may modify this Plan before a substantial Consummation of this Plan, with the approval of this Court.

# ARTICLE XI

## PROVISIONS FOR CLASSES OR HOLDERS OF CLAIMS
## WHICH ARE AFFECTED BY AND DO NOT ACCEPT THE PLAN

**11.1** Any class or holders of claims or interests which are affected by and do not vote to accept the Plan in accordance with the provisions of Bankruptcy Code Section 1126 shall be treated in a fair and equitable fashion as provided by Bankruptcy Code Section 1129(b).

## ARTICLE XII

## EVENT OF DEFAULT

**12.1** The occurrence of any one of the following shall constitute a default by the Debtor under the Plan:

If (a) the Debtor defaults in making payments due under the Plan (and the grace period provided for herein shall have passed), and unless such default (hereinafter referred to as an "Event of Default") has been waived in accordance with the terms herein; (b) the Debtor breaches any of the covenants contained herein prior to payment of payments due under the Plan; (c) the Debtor seeks relief under any Federal or State statute (other than the Debtor's present Chapter 11 case); (d) or a receiver, liquidator, custodian, or trustee is appointed for substantially all of the property of the Debtor prior to completion of the payment of payments due. Upon the occurrence of an Event of Default, any Creditor shall notify the Debtor therefor, and with the exception of any monetary default on account of payment, the Debtor shall have ten (10) business days from the date of the sending of such notice, to cure such breach. With respect to a breach for non-payment, the Debtor shall have a cure period of five (5) business days. In the event the Debtor fails to cure such breach within the prescribed periods, the Debtor shall be deemed to have defaulted on the terms of the Plan, and the

Creditors shall have all rights available to them under State Law or the Bankruptcy Code and the Bankruptcy Rules, or under this Plan including conversion to a Chapter 7 case.

## ARTICLE XIII

## DISCHARGE AND RELEASE

13.1    Pursuant to Section 1141(d) of the Bankruptcy Code, the Confirmation Order shall discharge claims against the Debtor.  Except as expressly provided herein, the rights afforded in the Plan and the treatment of all Creditors and holders of Stock Interest provided herein shall be in exchange for and in complete satisfaction, discharge and release of all Claims arising out of the transaction involving this Debtor existing as of the Confirmation Date, of any nature whatsoever, whether known or unknown, contingent or liquidated including any interest accrued or expenses incurred thereon from and after the Debtor's Petition Date, against the Debtor and the Debtor-in-Possession (or any of its properties or interest in properties), the Officers and Directors of the Debtor and the Professionals representing the Debtor (arising out of services in connection with this Chapter 11 case) in this Chapter 11 case (excluding negligence acts of wilful misconduct ultra virus acts and breach of fidiciary duty). Except as otherwise provided in the Plan, upon the Confirmation Date, all *Such* Claims against the Debtor and the above referred to professionals will be satisfied, discharged and released (except for those obligations identified in the Plan) in full exchange for the consideration provided for hereunder.  All persons and entities shall be precluded from asserting against the Debtor, its successors, its respective assets or properties and the above referenced persons and professionals, any of the above Claims that occurred prior to the Confirmation Date.

13.2    The effects of Confirmation of the Plan are set forth in the Bankruptcy Code. The following is a brief summary of the effect of Confirmation upon the Debtor, its creditors and other

interested parties. Upon Confirmation, the provisions of the Plan will bind the Debtor, its equity holders and creditors, whether or not they have accepted the Plan. All liens and claims are canceled and extinguished unless dealt with differently in the Plan. Satisfaction of the Debtor's pre-Chapter 11 debts and those incurred subsequently to the commencement of this case all are governed by the Plan.

## ARTICLE XIV

## INJUNCTION AND EXONERATION

**14.2** Except as otherwise provided in the Plan or Confirmation Order on and after the Confirmation Date, all entities which have held, currently hold or may hold a debt, claim, other liability of interest against the Debtor pursuant to the provisions of Section 1141(d) of the Bankruptcy Code and this Section, are permanently enjoined from taking any of the following actions on account of such debt, claim, liability, interest or right: (a) commencing or continuing in any manner any action or other proceeding on account of such claim against property which is to be distributed under this Plan, other than to enforce any right to distribution with respect to such property under the Plan; (b) enforcing, attaching collecting or recovering in any manner or judgment, award, decree, order other than as permitted under Sub-paragraph (a) above; and (c) creating, perfecting or enforcing any lien or encumbrance against any property to be distributed under this Plan.

## ARTICLE XV

## RETENTION OF JURISDICTION AND DISCHARGE

**15.1** Notwithstanding Confirmation, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(a)     Determination of the allowability of Claims upon objections filed to such Claims;

(b)    Determination of requests for payment of Claims and fees entitled to priority

under Section 507;

(c)    Resolution of any disputes concerning the interpretation of the Plan;

(d)    Implementation of the provisions of the Plan;

(e)    Entry of Orders in aid of Consummation of the Plan;

(f)    Modification of the Plan pursuant to Section 1127 of the Code;

(g)    Adjudication of any causes of action including voiding powers

actions commenced by the Debtor-in-Possession; and

(h)    Entry of a Final Order of Consummation and closing the case.

Dated: New York, New York
       March 1, 2010

SOUTHSIDE HOUSE, LLC

By:  /s/ Max Stark
     MAX STARK

By:  /s/ Leo Fox
     LEO FOX (LF-1947)
     Attorney for Debtor
     and Debtor-in-Possession
     630 Third Avenue
     New York, New York  10017
     (212) 867-9595

# Southside House LLC

## Construction account

### January through December 2008

| Account | Memo | Debit | Credit | Balance |
|---|---|---|---|---|
| Construction - 98 S 4 | | | | 65,000.00 |
| | Demolition | 65,000.00 | | 65,000.00 |
| | Removal of Oil tanks | 60,000.00 | | 125,000.00 |
| | Back fill with soil | 30,000.00 | | 155,000.00 |
| | brick & Blocks | 55,000.00 | | 210,000.00 |
| | Clean of Bldg. | 15,000.00 | | 225,000.00 |
| | Roof | 110,000.00 | | 335,000.00 |
| | Steel Work | 30,000.00 | | 365,000.00 |
| | Masonary Floor | 35,000.00 | | 400,000.00 |
| | Painting | 40,000.00 | | 440,000.00 |
| | Plans expeditor | 15,000.00 | | 455,000.00 |
| Total Construction - 98 S 4 | | 455,000.00 | 0.00 | 455,000.00 |
| | | | | |
| Construction - 114 S 4 | | | | 60,000.00 |
| | Demolition | 60,000.00 | | 60,000.00 |
| | Brick & Block | 40,000.00 | | 100,000.00 |
| | Foundation | 25,000.00 | | 125,000.00 |
| | Roof | 35,000.00 | | 160,000.00 |
| | Steel work | 75,000.00 | | 235,000.00 |
| | water & sewer | 15,000.00 | | 250,000.00 |
| | | 40,000.00 | | 290,000.00 |
| Total Construction - 114 S 4 | | 290,000.00 | 0.00 | 290,000.00 |
| | | | | |
| Total Construction | | | | 745,000.00 |

# SOUTH SIDE HOUSE, LLC

## BALANCE SHEET AS OF CONFIRMATION
### (ESTIMATED AND APPROXIMATE)

### ASSETS

Real property located at:

    98-116 South Fourth Street        $29,000,000
    Brooklyn, New York

                   TOTAL:

### LIABILITIES

-Bank of America - First Mortgage ($29,000,000)    $29,000,000

-Unsecured Creditors                    $ 1,750,000-
                             $ 2,250,000

                 TOTAL:    $30,750,000

South Side House LLC
Projections

| | 2010 | 2011 | 2012 |
|---|---|---|---|
| Ordinary Income/Expense | | | |
|   Annual Income | | | |
|     Rental Income | 2,461,770 | 2,511,005 | 2,561,226 |
|     Projected Commercial Tenent | | 180,000 | 180,000 |
|   Total Income | 2,461,770 | 2,691,005 | 2,741,226 |
|   Expense | | | |
|     Bank Charges | | - | - |
|     Broker Fees | 100,000 | 102,000 | 104,040 |
|     Insurance | 37,364 | 38,111 | 38,874 |
|     License & Fees | 11,934 | 12,173 | 12,416 |
|     Payroll Expense | 42,900 | 43,758 | 44,633 |
|     Repair & Maintenance | 86,103 | 87,825 | 89,582 |
|     Supplies | 10,681 | 10,895 | 11,113 |
|     Telephone | 1,200 | 1,224 | 1,248 |
|     Utilities | 16,500 | 16,830 | 17,167 |
|     Professional Fees | 14,688 | 14,982 | 15,281 |
|     Debt Financing | 1,667,500 | 1,667,500 | 1,667,500 |
|     Property Taxes | 220,000 | 271,000 | 335,000 |
|     Management Fees | 123,089 | 134,550 | 137,061 |
|     Additional mortgage Payments | | | |
|   Total Expense | 2,331,959 | 2,400,847 | 2,473,914 |
| | | | |
| Net Income ( Pre Reorg. Payments) | 129,811 | 290,158 | 267,312 |
| | | | |
| | | | |
| Reorganization Payments | | | |
| | | | |
|   Creditors | | | |
| | | | |
| Net Income ( Post Reorg. Payments) | 129,811 | 290,158 | 267,312 |

Anticipated 2% increase in Revenue & Expenses

Cash Flow (12/23/09)



# SOUTH SIDE HOUSE, LLC

## LIQUIDATION ANALYSIS

### ASSETS

Real property located at:

| | |
|---|---|
| 98-116 South Fourth Street<br>Brooklyn, New York | $19,000,000 |
| **TOTAL:** | |

### LIABILITIES

| | |
|---|---|
| - Bank of America - First Mortgage | $29,000,000 |
| - Broadway Bank - Second Mortgagee<br>($1,500,000,000) (Principle) | $ -0- |
| - Construction Contractors ($17,000) | $ -0- |
| - Chapter 7 Administration Expense | $ 100,000 |
| - Brokers' Fees | $ 250,000 |
| **TOTAL:** | -$10,350,000 |