UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:

           SOUTH SIDE HOUSE, LLC,

                         Debtor.
----------------------------------------------------------------x

Chapter 11
Case No. 09-43576


**MEMORANDUM DECISION ON OBJECTION TO CLAIM**


Appearances:

Leo Fox, Esq.
Stephanie Park, Esq.
630 Third Avenue, 18th Floor
New York, NY 10017
  *Attorneys for South Side House, LLC*

Joseph Lubertazzi, Jr., Esq.
Peter Knob, Esq.
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
  *Attorneys for U.S. Bank National*
  *Association, as Trustee*

**HONORABLE ELIZABETH S. STONG**
**UNITED STATES BANKRUPTCY JUDGE**

South Side House, LLC, the Debtor in this Chapter 11 bankruptcy case, seeks the entry of

an order modifying the claim of its principal creditor, U.S. Bank National Association, as

successor-in-interest to Bank of America, N.A., as Trustee for the registered holders of J.P.

Morgan Chase Commercial Mortgage Securities Trust 2007-LDP11 Commercial Mortgage Pass-

Through Certificates, Series 2007-LDP11 (the "Lender").  The issues to be decided are whether

the Lender is entitled to prepetition default interest, and if so, from what date; whether the Lender

is entitled to prepayment consideration; and how much the Lender may claim in special servicer

fees and expenses.[1]  These issues require careful attention to the precise terms of the parties'

agreements within the framework established by the Bankruptcy Code and the applicable

principles of New York law, including New York's rule of "perfect tender in time."  For the

reasons stated herein, the Debtor's motion is granted in part and denied in part.

## <u>Jurisdiction</u>

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and

157(b)(1).  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (B).  This

decision constitutes the Court's findings of fact and conclusions of law to the extent required by

Federal Rule of Civil Procedure 52, as made applicable to this proceeding by Federal Rule of

Bankruptcy Procedure 7052.

---

[1] In their pre-trial submissions and proposed findings of fact and conclusions of law, the parties also address whether the Debtor's post-petition payments to the Lender should be applied to reduce the Lender's claim.  This issue is not raised in the Debtor's claim objection, and does not affect the amount of the Lender's prepetition claim.  Rather, it relates to the extent that the Lender's claim has been reduced while this case has been pending.  As such, it will be considered separately.

## **Background**

This single asset real estate case has been pending since April 30, 2009, when the Debtor sought relief under Chapter 11 of the Bankruptcy Code.  The Debtor owns and operates a mixed-use building consisting of over 70 residential units and two commercial units located at 98-116 South Fourth Street in Brooklyn (the "Property").  The Debtor's assets include the Property and the rental income that it generates.  The Debtor continues to operate its business pursuant to Bankruptcy Code Sections 1107 and 1108.

In April 2007, the Debtor executed a note, mortgage, and assignment of leases and rents (the "Loan Documents") which were later assigned to the Lender.  The Debtor defaulted under the Loan Documents by not making the monthly payment due in November 2008, or any monthly payments thereafter and, according to the Lender, by granting a second mortgage to Broadway Bank without the Lender's consent.

In December 2008, CWCapital Asset Management, LLC ("CWCapital") was retained by the Lender as a special servicer.  In January 2009, the Lender accelerated the debt and brought a foreclosure action in the U.S. District Court for the Eastern District of New York.  In February 2009, the District Court appointed a receiver to manage the Property, and in April 2009, the court granted the Lender's motion for summary judgment.  But before a master was appointed to compute damages, the Debtor commenced this bankruptcy case, staying those proceedings.

The Lender filed a claim in the amount of $36,833,639.68.  That claim consists of $29 million in principal, $911,677.36 in non-default interest from October 10, 2008 to the petition

date, $688,750 in default interest from November 11, 2008 to the petition date, $5,954,395.26[2] in

prepayment consideration, $290,000 representing the fees and expenses anticipated to be paid to

the special servicer, and other charges, less certain credits.  Broadway Bank also filed a secured

claim in excess of $1.5 million, arising from the second mortgage on the Property, and that claim

is treated as unsecured in the Debtor's proposed plan of reorganization (the "Plan").

The Loan Documents

In April 2007, the Debtor executed a Consolidated, Amended and Restated Promissory

Note in favor of UBS Real Estate Securities Inc. ("UBS"), in the amount of $29 million (the

"Note").  At the same time, the Debtor executed a Consolidated, Amended and Restated

Mortgage, Assignment of Leases and Rents and Security Agreement in favor of UBS (the

"Mortg.").  The Loan Documents are governed by New York law.

### *Default and Default Interest*

The Note provides that payments are due on the tenth day of each month and are to be

paid from June 2007 to April 2017.  Under the Note, the annual interest rate is 5.575 percent and

the default interest rate is an additional five percent.

The Mortgage defines an "Event of Default" to include nonpayment of "any portion of

the Debt . . . on or before the date the same is due . . . ."  Mortg. § 10.1(a).  And the Mortgage

provides that default interest is payable "from the date of an Event of Default through the earlier

of the date upon which the Event of Default is cured or the date upon which the Debt is paid in

full . . . ."  Mortg. § 10.3.

---

[2]  The Lender later recalculated the amount of prepayment consideration to be
$7,481,655.87, noting that under the Loan Documents the amount should have been calculated as
of the acceleration of the debt on January 9, 2009.

In addition, Article 4 of the Note entitled "DEFAULT INTEREST" provides:

Borrower does hereby agree that upon the occurrence of an Event of Default, Lender shall be entitled to receive . . . [interest at the "Default Rate"]. The Default Rate shall be computed from the occurrence of the Event of Default until the earlier of the date upon which the Event of Default is cured or the date upon which the Debt is paid in full.

Note Art. 4.

*Default and Acceleration*

The "Default and Acceleration" provision of the Note states:

[The Debt shall] without notice become immediately due and payable at the option of Lender if any payment required in this Note is not paid on or before the date the same is due or on the Maturity Date or on the happening of any other default, after the expiration of any applicable notice and grace periods, herein or under the terms of the Security Instrument or any of the Other Security Documents (collectively, an "Event of Default").

Note Art. 3. The "Debt" includes:

(a) The whole of the principal sum of this Note, (b) interest, default interest, late charges and other sums, as provided in this Note, the Security Instrument or Other Security Documents . . . , (c) all other monies agreed or provided to be paid by Borrower in this Note, the Security Instrument or the Other Security Documents, (d) all sums advanced pursuant to the Security Instrument to protect and preserve the Property . . . and the lien and the security interest created thereby, and (e) all sums advanced and costs and expenses incurred by Lender in connection with the Debt . . . or any part thereof, any renewal, extension, or change of or substitution for the Debt or any part thereof, or the acquisition or perfection of the security therefor, whether made or incurred at the request of the Borrower or Lender . . . .

*Id*.

*Prepayment, the Prepayment Premium, and Evasion*

Under the Note, the borrower has the right to "prepay the unpaid principal balance of

[the] Note" two years after the first date on which monthly payments are due, provided that the

borrower provides adequate notice, pays the entire unpaid principal balance of the Note, interest

4

accrued and unpaid on the principal balance, an amount equal to the interest that would have

accrued on the amount being prepaid, other sums due under the Note, and a "prepayment

consideration . . . equal to the greater of (i) one percent . . . of the principal balance of this Note

being prepaid and (ii) the Yield Maintenance Premium . . . ."  Note Art. 5, § 5.2(a).

The "Yield Maintenance Premium" is:

[A]n amount equal to the excess of (i) the sum of the present values of a series of
payments payable at the times and in the amounts equal to the payments of
principal and interest (including, but not limited to the principal and interest
payable on the Maturity Date) which would have been scheduled to be payable
after the date of such tender under this Note had this Note not been prepaid, with
each such payment discounted to its present value at the date of such tender at the
rate which when compounded monthly is equivalent to the Prepayment Rate . . .
over (ii) the then principal amount of this Note.

Note Art. 5, § 5.2(d).  And the "Prepayment Rate" is:

[T]he bond equivalent yield (in the secondary market) on the United States
Treasury Security that as of the [date that is five business days prior to the
prepayment date] has a remaining term to maturity closest to, but not exceeding,
the remaining term to the Maturity Date, as most recently published in the
"Treasury Bonds, Notes and Bills" section in The Wall Street Journal as of the
date of the related tender of payment.

*Id*.

Mortgage Section 9.1 concerns prepayment before default and provides that the loan must

be repaid in accordance with the terms of the Note, including payment of the prepayment

consideration or premium.  Section 9.2 provides that the Debtor is not required to pay the

prepayment consideration or premium if the prepayment results from casualty or condemnation,

unless there is an event of default.  And Section 9.3 governs payment after default and

acceleration:

Following an Event of Default and acceleration of the Debt, if Borrower or

5

anyone on Borrower's behalf makes a tender of payment of the amount necessary to satisfy the Debt at any time prior to foreclosure sale (including, but not limited to, sale under power of sale under this Security Instrument), or during any redemption period after foreclosure, (i) the tender of payment shall constitute an evasion of Borrower's obligation to pay any prepayment consideration or premium due under the Note and such payment shall, therefore, to the maximum extent permitted by law, include a premium equal to the prepayment consideration or premium that would have been payable on the date of such tender had the Debt not been so accelerated, or (ii) if at the time of such tender a prepayment would have been prohibited under the Note had the Debt not been so accelerated, the tender of payment shall constitute an evasion of such prepayment prohibition and shall, therefore, to the maximum extent permitted by law, include an amount equal to the greater of (i) 3% of the then principal amount of the Note and (ii) an amount equal to the excess of (A) the sum of the present values of a series of payments payable at the times and in the amounts equal to the payments of principal and interest (including, but not limited to the principal and interest payable on the Maturity Date (as defined in the Note)) which would have been scheduled to be payable after the date of such tender under the Note had the Debt not been accelerated, with each such payment discounted to its present value at the date of such tender at the rate which when compounded monthly is equivalent to the Prepayment Rate (as defined in the Note), over (B) the then principal amount of the Note.

Mortg. § 9.3.

### *Special Servicer Fees*

Under Mortgage Section 19.1, the Lender is authorized to retain a master or special servicer. Section 20.1 governs the payment of special servicer fees. It provides:

Borrower acknowledges and confirms that Lender shall impose certain administrative processing . . . fees . . . if the servicer, in its reasonable determination, anticipates that there will occur an Event of Default and the Loan is transferred to a special servicer [an "Event"] . . . . Borrower hereby acknowledges and agrees to pay, immediately, . . . all such fees . . . and any additional fees of a similar type or nature which may be imposed by Lender from time to time, upon the occurrence of any Event or otherwise.

Mortg. § 20.1.

The Claim Objection

On August 12, 2009, the Debtor filed its motion to object to the Lender's claim (the "Obj."), on October 1, 2009, the Lender filed a response (the "Resp."), and on October 14, 2009, the Debtor filed a reply (the "Reply").

The Debtor states that default interest should not be allowed because it is "not authorized . . . [,] inequitable under the Bankruptcy Code, the claims have not been established to represent actual compensatory damages, [and the Lender] did not properly demand such interest . . . ." Obj. ¶ 4. The Debtor also argues that the reinstatement of the debt under a cure plan pursuant to Bankruptcy Code Section 1124 would eliminate the default interest.

The Debtor argues that the prepayment consideration should be disallowed for the same reasons and because "the Debtor does not intend to prepay the loan and therefore, the sums are not due . . . ." Obj. ¶ 5. And the Debtor states that a creditor is not entitled to prepayment consideration unless it is reasonable and the creditor "incurred actual costs and expenses beyond its normal operating costs attributable to the loan." Obj. ¶ 15.

And the Debtor argues that the Lender's claim for $290,000 in special servicer fees and expenses should not be allowed because it is not substantiated, is not authorized under the Bankruptcy Code, does not correspond to actual compensatory damages, and was not properly demanded by the Lender.

In response, the Lender states that default interest and prepayment consideration are provided for in the Loan Documents and permitted under New York law. The Lender contends that the Debtor's reliance on Bankruptcy Code Section 1124 is premature because when the motion was made, the Debtor had not filed a plan of reorganization. And the Lender argues that

even under a cure plan, it would be entitled to default interest.  As to the special servicer fee, the

Lender argues that under the Loan Documents it may retain a special servicer, and pursuant to

that authority it retained CWCapital in December 2008.  The Lender also notes that the Loan

Documents require the Debtor to pay the special servicer fees and expenses, and that the amount

claimed is reasonable in light of the amounts that have already accrued and will continue to

accrue.

In reply, the Debtor argues that as to default interest, bankruptcy law permits courts to

balance the equities and consider factors including the distribution rights of creditors, whether

the default rate would render injustice to the concept of the equitable distribution of assets, and

the purpose and reasonableness of the default interest rate.  The Debtor contends that under the

facts of this case, those factors and the Debtor's insolvency weigh against allowing default

interest.

As to prepayment consideration, the Debtor argues that the Loan Documents are

ambiguous as to "whether the prepayment consideration is in fact an integral part of the default

amount and whether it must be paid when the borrower does not seek to prepay the loan, but

instead stays with the loan."  Reply ¶ 9.  In particular, the Debtor notes that prepayment

consideration is not listed in Article 3 of the Note as a specific charge due upon default and

acceleration, and that Section 9.3 of the Mortgage, which concerns the payment of prepayment

consideration after default and acceleration, "does not contemplate that there might be an event

of default, an acceleration, and no attempt to prepay."  Reply ¶ 9.  The Debtor also observes that

Section 10.3, the default interest provision, "states categorically that the default interest is

payable from default."  Reply ¶ 10.  And the Debtor argues that the Lender has not shown how it

calculated the amount of the prepayment consideration.

On May 28, 2010, after the parties completed discovery on the issues raised in the Objection, they filed a joint pre-trial statement. An evidentiary hearing was held on June 18, 2010, at which the Court received evidence including the Loan Documents and heard the testimony of Alex Killick, an associate general asset manager of CWCapital. On August 9, 2010, the parties filed a first revised joint pre-trial statement. And on August 23, 2010, the Lender and the Debtor filed separate proposed findings of fact and conclusions of law ("LFOF" and "DFOF," respectively).

Mr. Killick testified that his role at CWCapital is to examine loans and to determine workout and other strategies to recover value for the trust and that he had worked on the subject loan from the time it went into special servicing in December 2008. He also discussed the purpose of the prepayment clause in the Loan Documents and how the prepayment consideration is calculated. And Mr. Killick testified as to how the default interest is calculated.

The parties stipulate to certain elements of the Lender's claim. For purposes of fixing the secured portion of the Lender's claim and confirmation of the Plan, the parties agree that the Lender's allowed secured claim is $29 million. They also stipulate that the principal balance is $29 million, the accrued non-default interest is $911,667.36, the aggregate special servicer expenses are $87,098.21, and the master servicer expenses are $1,120.74. The parties also agree that the monthly special servicer fee is $6,000.

The parties also agree that the Debtor is entitled to credits of $3,694.47, representing the insurance escrow balance as of the petition date, and $175,966.93, representing another escrow account balance as of the petition date. And the parties stipulate that the default interest rate is

five percent per year, or $4,027.7778 per day, and that the Debtor did not make the monthly

payment that was due on November 10, 2008, or any payments thereafter.

The Debtor's Plan of Reorganization

The Debtor filed a Chapter 11 plan of reorganization on October 15, 2009, an amended

plan on January 14, 2010, and a second amended plan on March 1, 2010.  The Plan designates

four classes of claims.  In relevant part, Class 1 consists of the allowed secured claim of the

Lender, Class 2 consists of allowed unsecured claims, and Class 3 consists of any allowed claims

of the Lender for default interest or prepayment consideration.

The Lender and Broadway Bank filed objections to the Plan.  The Debtor filed an

amended disclosure statement on March 1, 2010, with supplemental objections to the Lender's

claim.  The amended disclosure statement was approved without objection by Order entered on

March 22, 2010.

On April 26, 2010, the Debtor filed a Statement of Voting on the Plan.  The Lender as the

sole member of Class 1 voted to reject the Plan.  Three unsecured creditors with Class 2 claims

with an aggregate value of $1,568,781 voted to accept the Plan, and the Lender voted its Class 2

unsecured claim to reject the Plan.  As a result, the Debtor notes that if the Lender's total

unsecured claim is not greater than $784,389, Class 2 will be deemed to have accepted the Plan.

The Lender also voted to reject the Plan to the extent that it is properly classified in Class 3.

## Discussion

The Debtor's claim objection raises questions concerning the interpretation and

application of several terms in the Loan Documents, under both bankruptcy and nonbankruptcy

law.  To answer these questions, the Court must consider the applicable Bankruptcy Code

10

definitions, the procedures for objecting to a claim, the status of a claim as secured or unsecured, and New York's law governing contract interpretation.

<u>Definitions</u>

Bankruptcy Code Section 101(5) defines a "claim" broadly to mean a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ." 11 U.S.C. § 101(5)(A). The Supreme Court has observed that Congress "intended by this language to adopt the broadest available definition of 'claim.'" *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991). As the Second Circuit has explained, "the term 'claim' is sufficiently broad to encompass any possible right to payment." *Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295, 302 (2d Cir. 1997). And "a valid bankruptcy claim depends on (1) whether the claimant possessed a right to payment, and (2) whether that right arose before the filing of the petition." *LTV Steel Co. v. Shalala (In re Chateaugay Corp.)*, 53 F.3d 478, 497 (2d Cir.), *cert. denied*, 516 U.S. 913 (1995).

A "contingent" claim under the Bankruptcy Code refers "to obligations that will become due upon the happening of a future event that was within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created." *Olin Corp. v. Riverwood Int'l Corp. (In re Manville Forest Prods. Corp.)*, 209 F.3d 125, 128-29 (2d Cir. 2000) (internal quotation marks omitted). "'A claim will be deemed to have arisen pre-petition if the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation – a right to payment – under the relevant non-bankruptcy law.'" *Ogle v. Fidelity & Deposit Co. of Md.*, 586 F.3d 143, 147 (2d Cir. 2009) (quoting *Manville Forest Prods.*

*Corp.*, 209 F.3d at 129), *cert. denied*, 120 S. Ct. 2373 (2010).

Claim Procedures

A claim will be allowed to the extent it is permissible under nonbankruptcy law, "'subject to any qualifying or contrary provisions of the Bankruptcy Code.'" *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007) ("*Travelers*") (quoting *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000)). That is, claims that are "enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed." *Travelers*, 549 U.S. at 452 (citing 11 U.S.C. § 502(b)). Accordingly, if a claim arises from a prepetition right to payment under applicable nonbankruptcy law, then there is a presumption that the claim will be allowed, subject to an express provision of the Bankruptcy Code disallowing it.

Bankruptcy Code Section 501(a) provides that to claim an interest in a debtor's bankruptcy estate, "[a] creditor . . . may file a proof of claim." 11 U.S.C. § 501(a). Bankruptcy Rule 3001(f) states that "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). And Section 502(a) provides that a claim that is properly filed under Bankruptcy Rule 3001 and Section 501 is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a).

Pursuant to Bankruptcy Code Section 502(b), if an objection is made, then the court shall determine the amount of the allowed claim. 11 U.S.C. § 502(b).[3] Under Section 502(b), a claim

---

[3] In relevant part, Sections 502(a) and (b) provide:

(a)     A claim or interest, proof of which is filed under section 501 of this title, is
        deemed allowed, unless a party in interest . . . objects.

(b)     . . . if such objection to a claim is made, the court, after notice and a
        hearing, shall determine the amount of such claim in lawful currency of
        the United States as of the date of the filing of the petition, and shall allow

is determined as of the filing date of the petition.  *In re Solutia, Inc.*, 379 B.R. 473, 483 (Bankr. S.D.N.Y. 2007).

A claim will not be allowed to the extent that it is unenforceable under any agreement or applicable nonbankruptcy law.  11 U.S.C. § 502(b)(1).  And a claim will not be allowed to the extent that it is for unmatured interest.  11 U.S.C. § 502(b)(2).  As explained by one court, "[t]he Bankruptcy Code does not define 'unmatured interest,' but case law has determined that unmatured interest includes interest that is not yet due and payable at the time of a bankruptcy filing, or is not yet earned."  *HSBC Bank USA v. Calpine Corp.*, 2010 WL 3835200, at *5 (S.D.N.Y. Sept. 15, 2010).  If a claim is contingent or unliquidated, the court shall estimate the claim if "the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . . ."  11 U.S.C. § 502(c).

The party objecting to a properly filed claim has the burden of coming forward with evidence that is sufficient to overcome the claim's prima facie validity.  *See Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (B.A.P. 2d Cir.) (stating that "[t]o overcome this prima facie evidence, the objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim"), *aff'd*, 242 F.3d 367 (2d Cir. 2000).  "If the objector does not introduce[] evidence as to the invalidity of the claim or the excessiveness of its

---

       such claim in such amount . . . [unless]

    (1)     such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured;

    (2)     such claim is for unmatured interest . . . .

11 U.S.C. § 502(a), (b).

amount, the claimant need offer no further proof of the merits of the validity and the amount of the claim." *In re Minbatiwalla*, 424 B.R. 104, 111 (Bankr. S.D.N.Y. 2010) (internal quotation marks omitted). But the ultimate burden of proof with respect to a disputed claim lies with the claimant. *See Raleigh*, 530 U.S. at 21; *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 174 (3d Cir. 1992) (explaining that "[i]f the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence").

Claim Status

Bankruptcy Code Section 506 addresses the secured status of a claim and the rights of a secured creditor. Section 506(a) provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a)(1). That is, if a creditor is not oversecured, it has a secured claim equal to the value of the collateral and an unsecured claim for the balance. As the Supreme Court has explained, "[t]he phrase 'value of such creditor's interest' in § 506(a) means 'the value of the collateral.'" *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 372 (1988). While the amount of a claim is determined as of the petition date, the Bankruptcy Code does not specify the time period for valuation of collateral, and many courts have adopted a flexible approach. *See, e.g.*, *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. (In re T-H New*

*Orleans Ltd.)*, 116 F.3d 790, 798 (5th Cir. 1997) (observing that a flexible approach to timing of

valuation "recognizes the discretionary nature of bankruptcy courts as courts of equity").  For

example, for purposes of plan confirmation, a majority of courts value the collateral as of a date

on or near the date of confirmation.  *See, e.g.*, *Planavsky v. County of Broome (In re Planavsky)*,

432 B.R. 481, 485 (Bankr. N.D.N.Y. 2010); *In re Melgar Enters.*, 151 B.R. 34, 39 (Bankr.

E.D.N.Y. 1993); *Ahlers v. Norwest Bank Worthington (In re Ahlers)*, 794 F.2d 388, 398 (8th Cir.

1986), *rev'd on other grounds*, 485 U.S. 197 (1988).

Bankruptcy Code Section 506(b) provides additional rights to an oversecured creditor:

> To the extent that an allowed secured claim is secured by property the value of
> which, after any recovery under [Section 506(c)], is greater than the amount of
> such claim, there shall be allowed to the holder of such claim, interest on such
> claim, and any reasonable fees, costs, or charges provided for under the agreement
> or State statute under which such claim arose.

11 U.S.C. § 506(b).  That is, if a creditor is oversecured, it is entitled to interest on its claim and

its reasonable contractual fees and costs.  And an undersecured creditor is generally not entitled

to post-petition interest, fees, costs, or charges with respect to its claim.  *See Timbers*, 484 U.S. at

379-82; *T-H New Orleans Ltd.*, 116 F.3d at 799 (concluding that if a creditor becomes

oversecured during the bankruptcy case, the "creditor's entitlement to accrue interest under

§ 506(b) matures at the point in time where the creditor's claim becomes oversecured");

*Kitrosser v. CIT Group/Factoring, Inc.*, 177 B.R. 458 (S.D.N.Y. 1995) (noting that post-petition

interest on undersecured debt is required when the debtor is solvent).

Contract Interpretation

In interpreting a contract, the court's initial inquiry "is whether the agreement on its face

is reasonably susceptible of more than one interpretation" and "matters extrinsic to the agreement

may not be considered when the intent of the parties can be gleaned from the face of the instrument." *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 572-73 (1986) (internal quotation marks omitted). Perhaps the most fundamental principle of contract construction is that "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms . . . ." *Signature Realty, Inc. v. Tallman*, 2 N.Y.3d 810, 811 (2004) (internal quotation marks omitted). *See Salvano v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 85 N.Y.2d 173, 182 (1995) (observing that "[t]he court's role is limited to interpretation and enforcement of the terms agreed to by the parties; it does not include the rewriting of their contract and the imposition of additional terms."); *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992) (stating that "[a] court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case") (internal citations omitted).

The New York Court of Appeals has emphasized that this rule has "special import in the context of real property transactions, where commercial certainty is a paramount concern, and where . . . the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length . . . ." *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) (internal quotation marks omitted). As a result, "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include . . . ." *Vermont Teddy Bear Co.*, 1 N.Y.3d at 475 (internal quotation marks omitted).

Contract provisions must be interpreted in a manner that gives effect to the parties'

reasonable expectations at the time of contract formation.  *See Omni Berkshire Corp. v. Wells Fargo Bank*, 307 F. Supp. 2d 534, 539 (S.D.N.Y. 2004) (observing that "[u]nder New York law, the key to contract interpretation is the parties' reasonable expectations") (internal quotation marks omitted); *VTech Holdings Ltd. v. Lucent Techs. Inc.*, 172 F. Supp. 2d 435, 441 (S.D.N.Y. 2001) (stating that "the essence of contract interpretation . . . is to enforce a contract in accordance with the true expectations of the parties in light of the circumstances existing at the time of the formation of the contract") (internal quotation marks and citations omitted).

"General canons of contract construction require that where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect."  *Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 69 (2d Cir. 2002) (internal quotation marks omitted).  *See In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122, 130-31 (Bankr. E.D.N.Y. 2002) (observing that "[a]greements should not be interpreted in a way that renders any of the provisions superfluous or meaningless") ("*Vanderveer*").  And "[i]t is an elementary rule of contract construction that clauses of a contract should be read together contextually in order to give them meaning . . . ."  *HSBC Bank USA v. Nat'l Equity Corp.*, 279 A.D.2d 251, 253 (N.Y. App. Div. 1st Dep't 2001).

"It is axiomatic that courts construing contracts must give specific terms and exact terms . . . greater weight than general language."  *County of Suffolk v. Alcorn*, 266 F.3d 131, 139 (2d Cir. 2001) (internal quotation marks omitted).  "Even where there is no 'true conflict' between two provisions, specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate."  *Aramony v. United Way of Am.*, 254 F.3d 403, 413-14 (2d Cir.

17

2001) (internal quotation marks omitted).  And the words in a contract "'should be given the meanings ordinarily ascribed to them and absurd results should be avoided.'"  *Omni Berkshire Corp.*, 307 F. Supp. 2d at 540 (quoting *Newmont Mines, Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986)).

The Debtor's Objection to Prepetition Default Interest

"Interest, fees, costs and charges arising pre-petition are part of the secured creditor's claim in the first instance, and are therefore not governed by § 506(b)."  *Vanderveer*, 283 B.R. at 131.  *See T-H New Orleans Ltd.*, 116 F.3d at 797 (explaining that "[Section] 506(b) applies only from the date of filing through the confirmation date") (citing *Rake v. Wade*, 508 U.S. 464, 468 (1993)).  As such, a creditor's entitlement to prepetition interest under Section 502, default or otherwise, is determined in the first instance by the agreement between the parties and applicable nonbankruptcy law.

As the Second Circuit has explained, "[p]repetition interest is generally allowable [as a claim] to the extent and at the rate permitted under the applicable nonbankruptcy law, including the law of contracts."  *Key Bank Nat'l Ass'n v. Milham (In re Milham)*, 141 F.3d 420, 423 (2d Cir.), *cert. denied*, 525 U.S. 872 (1998).  Prepetition interest at a default rate is also allowable as a claim.  *See In re Woodmere Investors Ltd.*, 178 B.R. 346, 355 (Bankr. S.D.N.Y. 1995); *In re Schatz*, 426 B.R. 24, 27-28 (Bankr. D.N.H. 2009); *In re Star Trust*, 237 B.R. 827, 836-37 (Bankr. M.D. Fla. 1999).

Under New York law, "[i]t is well settled that an agreement to pay interest at a higher rate in the event of default or maturity is an agreement to pay interest and not a penalty."  *Jamaica Sav. Bank v. Ascot Owners, Inc.*, 245 A.D.2d 20, 20 (N.Y. App. Div. 1st Dep't 1997).  *See*

*Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959) (observing that "[a] variable interest provision in event of a stated default . . . is not a penalty, nor should it be considered unconscionable. . . . It can be beneficial to a debtor in that it may enable him to obtain money at a lower rate of interest than he could otherwise obtain it"), *cert. denied*, 361 U.S. 947 (1960). And it is well established that "contractual provisions providing for an increased interest rate on default are enforceable under New York law." *U.S. Trust Co. of N.Y. v. LTV Steel Co. (In re Chateaugay Corp.)*, 150 B.R. 529, 542 (Bankr. S.D.N.Y. 1993), *aff'd*, 170 B.R. 551 (S.D.N.Y. 1994).

As such, prepetition interest that is due under an enforceable agreement will generally be allowed unless one of the exceptions in Section 502(b) applies. *See, e.g.*, *Travelers*, 549 U.S. at 452.

### Whether the Lender Is Entitled to Default Interest

The Debtor argues that default interest should not be allowed where damages can be easily determined, the Debtor is insolvent, prejudice exists, the balancing of equities favors other creditors, and the amount sought is grossly disproportionate to the claimant's loss. The Debtor contends that it is insolvent because its liabilities exceed its assets, and that the Lender's actual losses will be covered by the proposed Plan. The Debtor further argues that there will be significant prejudice to other creditors if default interest in excess of $680,000 is allowed, as the payments to general unsecured creditors will be decreased by that amount. And the Debtor argues that the balancing of the equities favors denying the allowance of the default interest because the Lender will be paid all of its principal, interest, and out-of-pocket losses under the Plan, but other creditors holding claims of approximately $1.8 million will receive only a

percentage of their claims, and would receive 30 percent less if default interest is allowed.

The Debtor also argues that if default interest is allowed, the amount sought by the Lender should be reduced because it is not calculated in accordance with the Loan Documents. The Debtor argues that under the Note's acceleration and default provision, default interest does not begin to accrue until the Lender accelerates the debt. As such, the Debtor contends that the Lender erred in using November 10, 2008, the date of the default, as the accrual date, rather than January 9, 2009, the date of the acceleration letter. The Debtor notes that Mr. Killick testified that January 9, 2009, was the date that the special servicer elected to accelerate the loan and the date that the loan began accruing default interest.[4] The Debtor argues that if the date of acceleration is the accrual date for the default interest, the default period was 111 days, and at the stipulated per diem rate of $4,027.7778, the claim for default interest should be $447,082.47.

The Lender responds that it has met its burden of establishing that it is entitled to prepetition default interest because New York law provides that default interest provisions are enforced solely by reference to the governing loan documents, and the agreement between the Lender and the Debtor unambiguously provides for default interest upon the occurrence of a default. The Lender argues that "[t]he Debtor has not cited any New York cases holding that a default interest charge is an unenforceable penalty, and the Lender is not aware of any such cases." LFOF ¶ 18.

---

[4]  The Debtor also introduced several exhibits at the evidentiary hearing in support of its argument that January 9, 2009 is the date upon which default interest began to accrue. These include a document in which the special servicer requests that the master servicer provide a payoff calculation using January 9, 2009 as the accrual date, an April 22, 2009 letter in which the master servicer states that the default interest is $451,111.11, and a May 18, 2009 letter in which the master servicer states that the default interest is $285,972.22.

The Lender also responds that it is entitled to the full amount that it seeks because the

Loan Documents provide that default interest is due immediately after the Debtor misses a

payment. The Lender notes that it is undisputed that the Debtor did not make the monthly

payment due on November 10, 2008, so that it may collect default interest from November 11,

2008 through the petition date.

And the Lender argues that any contrary evidence is not persuasive and has "no bearing

on the validity of the Claim" for several reasons. LFOF ¶ 21. The Lender states that the

evidence shows that the correspondence between the master servicer and special servicer were

internal documents that were not communicated to the Debtor. And the Lender states that Mr.

Killick's testimony "merely demonstrates that, on cross-examination, Mr. Killick did not

correctly recall the date from which default interest was calculated in the Proof of Claim." LFOF

¶ 21.

As an initial matter, the Court must determine whether the default interest claimed by the

Lender is called for by the parties' agreement and applicable nonbankruptcy law. Agreements

that provide for an increased rate of interest upon default are generally enforceable under New

York law. Here, the Loan Documents provide for default interest in both specific and general

terms. The Note states that "upon . . . an Event of Default, Lender shall be entitled to . . . interest

on the entire unpaid principal sum at rate equal to . . . five percent . . . plus the Applicable

Interest Rate . . . ." Note Art. 4. The Mortgage states that the Lender is entitled to default

interest at an annual rate of five percent on the entire unpaid principal if the Debtor does not

make its monthly payment on the due date or otherwise defaults. And the Mortgage provides

that the "[b]orrower will pay [the default interest], from the date of an Event of Default through

the earlier of the date upon which the Event of Default is cured or the date upon which the Debt is paid in full . . . ."  Mortg. § 10.3.

The Note's default and acceleration provision is consistent with these terms.  It states that when the loan is accelerated, certain sums, including default interest, are due and payable without notice to the Debtor.  *See* Note Art. 3 ("[The Debt] shall without notice become immediately due and payable at the option of Lender if any payment required in this Note is not paid on or before the date the same is due or on the Maturity Date or on the happening of any other default, after the expiration of any applicable notice and grace periods, herein or under the terms of the Security Instrument or any of the Other Security Documents (collectively, an 'Event of Default').").

As the Loan Documents provide that the default interest becomes due upon default, without notice to the Debtor, the default interest was due whether or not the Lender accelerated the Loan.  Hence, the notice provided by the Lender's January 9, 2009 acceleration letter to the Debtor was not a precondition for the default interest to become due.  The Debtor does not dispute that it defaulted on November 10, 2008.  As a result, under the terms of the parties' agreement, the Lender is entitled to default interest from November 11, 2008 through the petition date.

The Court's next inquiry is whether the default interest claimed by the Lender is allowable under Bankruptcy Code Section 502.  The Lender's claim for prepetition interest at a default rate of five percent is a permissible charge under New York law.  As such, it is allowable under Section 502 unless an exception applies.  Here, the Lender's claim for prepetition default interest is not in the nature of unmatured interest under Section 502(b)(2), and none of the other

22

Section 502(b) exceptions bar the claim. *See* 11 U.S.C. § 502(b). *Cf. In re Vest Assocs.*, 217 B.R. 696, 702-03 (Bankr. S.D.N.Y. 1998) (denying post-petition default interest under Section 506(b) based on the debtor's potential insolvency); *Hassen Imports P'ship v. KWP Fin. VI (In re Hassen Import P'ship)*, 256 B.R. 916, 925 (B.A.P. 9th Cir. 2000) (denying post-petition default interest under Section 506(b) where the default interest rate was not equivalent to actual damages); *In re Zamani*, 390 B.R. 680, 688 (Bankr. N.D. Cal. 2008) (same).

For these reasons, and based on the entire record, the Lender's claim for $688,750 in default interest is allowed.

<u>The Debtor's Objection to Prepayment Consideration</u>

A claim for prepetition prepayment consideration is also governed by Section 502. *See Vanderveer*, 283 B.R. at 131. Under Section 502, courts consider whether prepayment consideration is due under the parties' agreement, and whether that agreement is enforceable under controlling nonbankruptcy law. *See, e.g.*, *United Merchs. & Mfrs. v. Equitable Life Assurance Soc'y of the U.S. (In re United Merchs. & Mfrs.)*, 674 F.2d 134, 137 (2d Cir. 1982). If prepayment consideration is due under an enforceable agreement, it will generally be allowed unless one of the exceptions in Section 502(b) applies. *See In re Granite Broad. Corp.*, 369 B.R. 120, 144 (Bankr. S.D.N.Y. 2007) (observing that "[p]repayment provisions have been found to be valid and enforceable in bankruptcy cases") (citing cases).

Prepayment provisions are the consequence of well-settled law, dating back to the early 19th century, that a borrower may not prepay its loan prior to its maturity date unless the parties otherwise agree or prepayment is allowed by statute. *See Friends Realty Assocs. v. Wells Fargo Bank*, 40 A.D.3d 287, 287 (N.Y. App. Div. 1st Dep't 2007) (citing *Arthur v. Burkich*, 131

A.D.2d 105, 107 (N.Y. App. Div. 3d Dep't 1987)).  This prohibition arises from the "rule of perfect tender in time," under which "a lender or mortgage investor has the absolute right to rely upon the income stream contracted for over the life of the loan."  *Nw. Mut. Life Ins. Co. v. Uniondale Realty Assocs.*, 11 Misc. 3d 980, 984 (N.Y. Sup. Ct. Nassau Co. 2006) (citing *Burkich*, 131 A.D.2d at 107).  In New York, the rule of perfect tender in time continues to apply in commercial real estate transactions, although it has been modified by statute in other contexts.  *See* N.Y. General Obligations Law § 5-501(3)(b).

But this is not the end of the inquiry, as parties may agree to grant the borrower an option voluntarily to prepay the loan and terminate the mortgage before the maturity date in exchange for prepayment consideration.  *See, e.g.*, *Poughkeepsie Galleria Co. v. Aetna Life Ins. Co.*, 178 Misc. 2d 646, 648 (N.Y. Sup. Ct. Dutchess Co. 1998).  These prepayment options "are included in mortgage agreements strictly for the benefit of the mortgagor and . . . will be enforced according to their terms."  *George H. Nutman, Inc. v. Aetna Bus. Credit, Inc.*, 115 Misc. 2d 168, 169 (N.Y. Sup. Ct. Queens Co. 1982).  Under such terms, prepayment consideration is payable when the borrower exercises its option to prepay the debt.

The amount of prepayment consideration is typically based on a fixed fee, such as a percentage of the principal balance at the time of prepayment, or a "yield maintenance formula" that serves as a proxy for the lender's actual damages in the event of prepayment.  *See, e.g.*, Scott K. Charles & Emil A. Kleinhaus, *Prepayment Clauses in Bankruptcy*, 15 Am. Bankr. Inst. L. Rev. 537, 543-44 (Winter 2007) ("Charles & Kleinhaus").

Prepayment consideration serves an important commercial purpose.  As one court explained:

24

> Prepayment can impose daunting economic sacrifices upon a mortgagee, not the
> least of which include the loss of the bargained-for rate of return, an increased tax
> burden, unanticipated costs occasioned by the need to reinvest the principal, and
> for those creditors anxious to ensure regular payments not unlike an annuity, it
> undoes the mortgagee's purpose in making the loan.

*Burkich*, 131 A.D.2d at 107.[5]  *See Teachers Ins. & Annuity Assoc. of Am. v. Butler*, 626 F. Supp.

1229, 1235 (S.D.N.Y. 1986) (noting that acceleration deprives lenders of the payment streams for

which they contracted).

Prepayment consideration and default interest serve different purposes.  Prepayment

consideration compensates the lender for the loss of its bargained-for yield, while default interest

compensates the lender for the expense and inconvenience caused by the default.  *See*

*Vanderveer*, 283 B.R. at 134; *Mony Life Ins. Co. v. Paramus Parkway Bldg., Ltd.*, 834 A.2d 475,

483 (N.J. Super. Ct. App. Div. 2003) (observing that "a prepayment premium is not [another

form of default] interest . . . because it is not compensation for the use of money but a charge for

the option or privilege of prepayment"); *Nw. Mut. Life Ins. Co.*, 11 Misc. 3d at 984 (stating that a

prepayment clause "is generally analyzed as an 'option' for alternative performance on the loan,

and any premium is deemed consideration or a *quid pro quo* for the option").

---

[5]  Mr. Killick described the purpose of prepayment consideration:

> [T]he mortgage in question, and many other mortgages were put into a pool of
> mortgages that was then sold as bonds.  And those bonds have a certain rate of
> return to the people who purchased them.  So if a loan is to be paid off prior to its
> maturity date, the prepayment consideration is intended to capture the interest that
> would have been paid over the term of the loan had the loan not been paid off.

Tr. at 33:6-12.  He testified that "[t]he purpose of the prepayment is to replicate the expected
cash flows from the interest payments of the loan."  Tr. at 33:14-15.  And he explained that the
"prepayment funds are used to purchase U.S. Treasury securities that will replicate the cash flows
that were expected from the loan, had the loan not been paid off."  Tr. at 35:18-20.

To protect this bargained-for yield, parties may also agree to "no-call" provisions that expressly prohibit prepayment, or "make-whole" provisions that provide for liquidated damages in default situations. *See In re Chemtura Corp.*, 439 B.R. 561, 596 (Bankr. S.D.N.Y. 2010). In effect, no-call provisions memorialize the rule of perfect tender in time. *See* Charles & Kleinhaus, 15 Am. Bankr. Inst. L. Rev. at 541-42. And parties may agree to terms that allow prepayment only after a no-call period.

In contrast to no-call provisions, make-whole agreements may set forth the circumstances under which prepayment consideration will be due after a default, and provide for damages based on a fixed fee, a yield maintenance formula, or both. As a general rule, a lender is not entitled to prepayment consideration after a default unless the parties' agreement expressly requires it. *See Granite Broad. Corp.*, 369 B.R. at 144; *Nw. Mut. Life Ins. Co.*, 11 Misc. 3d at 984-85 (citing cases). This is because prepayment provisions generally address the consideration to be paid when the borrower voluntarily prepays the debt, but after a default the borrower's repayment is neither voluntary nor in the nature of a prepayment.

For example, in a New York foreclosure action, the "equity of redemption" allows a borrower to redeem its property by tendering the entire amount due at any time before the foreclosure sale. *See NYCTL 1999-1 Trust v. 573 Jackson Ave. Realty Corp.*, 13 N.Y.3d 573, 579 (2009). Although a borrower must pay the debt in full in order to redeem the property, prepayment consideration is not included in a judgment of foreclosure because the "accelerated payment" results from the lender's "elect[ion] to bring [the] foreclosure action" and not the borrower's voluntary prepayment. *3C Assocs. v. IC & LP Realty Co.*, 137 A.D.2d 439, 440 (N.Y. App. Div. 1st Dep't 1988). *See Kilpatrick v. Germania Life Ins. Co.*, 183 N.Y. 163, 168-

69 (1905) (holding that lender was not entitled to prepayment consideration when borrower's repayment was involuntary).

Similarly, when a lender exercises its option to accelerate a loan, that acceleration date becomes the maturity date, and the entire debt becomes due. *See Solutia*, 379 B.R. at 484. By accelerating the loan, the lender elects "to give up [its] future income stream in favor of having an immediate right to collect [its] entire debt." *Solutia*, 379 B.R. at 488. Accordingly, a borrower's repayment after acceleration is not considered voluntary and does not trigger the lender's right to prepayment consideration. *See George H. Nutman, Inc.*, 115 Misc. 2d at 169-70 (citing *Kilpatrick*, 183 N.Y. at 168-69); *Granite Broad. Corp.*, 369 B.R. at 144. Viewed another way, a borrower's repayment following acceleration of the due date of a loan is not a prepayment of the obligation before it is due, so a prepayment term does not apply. *See Solutia*, 379 B.R. at 487-88 (holding that upon acceleration by the lender, unless the parties agree otherwise, a prepayment consideration provision does not apply) (citing *In re LHD Realty Corp.*, 726 F.2d 327, 330-31 (7th Cir. 1984)).

But the parties may agree that even after default and acceleration, or where the borrower's prepayment is otherwise involuntary, an amount that is equivalent to prepayment consideration may nevertheless be due. *See, e.g.*, *Fin. Ctr. Assocs. of East Meadow v. TNE Funding Corp. (In re Fin. Ctr. Assocs. of East Meadow)*, 140 B.R. 829, 835 (Bankr. E.D.N.Y. 1992) ("*Fin. Ctr. Assocs.*"); *SO/Bluestar, LLC v. Canarsie Hotel Corp.*, 33 A.D.3d 986, 987 (N.Y. App. Div. 2d Dep't 2006); *Nw. Mut. Life Ins. Co.*, 11 Misc. 3d at 987-89 (reviewing examples of post-default

agreements).[6]  And as a general rule, where this consideration is due after default and

acceleration, it will be included in a judgment of foreclosure.  *See SO/Bluestar, LLC*, 33 A.D.3d

at 987 (finding that the parties' agreement called for prepayment consideration in a foreclosure

action as of "the date on which the debt was accelerated and all sums became due and payable");

*E. Sav. Bank v. Munson*, 932 A.2d 1079, 1084 (Conn. Super. Ct. 2007) (stating that where the

parties' agreement "expressly provides for imposition of a prepayment premium upon

acceleration, that premium is required to be included in the final foreclosure judgment").

As one court explained, an agreement that prepayment consideration is payable "in

connection with premature payment *by anyone and at any time* after acceleration" makes this

consideration due after acceleration, and it will be included in a foreclosure judgment.  *Nw. Mut.*

*Life Ins. Co.*, 11 Misc. 3d at 988.  *See SO/Bluestar, LLC*, 33 A.D.3d at 987; *Munson*, 932 A.2d at

1084.[7]  This is because a foreclosure proceeding should result in payment of the debt, either by

the borrower to redeem the property or when the property is sold.  *See Nw. Mut. Life Ins. Co.*, 11

Misc. 3d at 990.

---

[6]  *See also* Restatement (Third) of Prop.: Mortgages § 6.2 cmt. c (1997) (discussing the "controversy" concerning "the collectibility" of prepayment consideration after default and acceleration and stating that "[i]n the first instance, the question is simply whether the relevant clause in the mortgage . . . purports to cover this sort of prepayment").

[7]  In *Munson*, the court relied on language stating:

> If this note is prepaid in whole or in part, whether the prepayment is voluntary or involuntary, including any prepayment affected by the Note Holder's exercise of the acceleration provision of this note or the Security Instrument . . . then borrower must pay a prepayment premium.

*Munson*, 932 A.2d at 1081.  The court noted that "[t]his is virtually the exact language of the note in" *SO/Bluestar, LLC*.  *Munson*, 932 A.2d at 1084.

Even in the absence of an express agreement, prepayment consideration may be awarded upon a finding that the borrower defaulted intentionally in order to avoid a prepayment penalty, trigger acceleration, and repay the debt. *See Granite Broad. Corp.*, 369 B.R. at 144; *Nw. Mut. Life Ins. Co.*, 11 Misc. 3d at 984-85 (citing cases). Parties may agree to an "evasion clause" designed to provide additional protection to the lender in the event of this kind of intentional default. *See, e.g.*, *Teachers Ins. & Annuity Ass'n of Am.*, 626 F. Supp. at 1235; *Nw. Mut. Life Ins. Co.*, 11 Misc. 3d at 990. For example, the parties may agree that a borrower's repayment of the debt after acceleration, or in the context of a foreclosure proceeding, will be deemed an evasion of the parties' prepayment agreement and the borrower will be required to pay prepayment consideration or an equivalent amount.

Clauses of this nature provide additional protection to the lender because when a borrower tenders payment in such circumstances, the lender does not have to address the borrower's intent. *See Nw. Mut. Life Ins. Co.*, 11 Misc. 3d. at 990. But here too, the parties' agreement must be express, and the terms of their agreement will define the parameters of the borrower's obligation to make this payment. *See id.* (finding that prepayment consideration was not due in foreclosure action where clause did not address redemption).[8]

Courts review prepayment consideration terms that are triggered by default and acceleration under the standards applicable to liquidated damages. *See In re Saint Vincent's Catholic Med. Ctrs. of N.Y.*, 440 B.R. 587, 594-95 (Bankr. S.D.N.Y. 2010); *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 416 (Bankr.

---

[8] Courts in this Circuit have also awarded expectation damages for breach of no-call provisions. *See, e.g.*, *Teachers Ins. & Annuity Ass'n of Am.*, 626 F. Supp. at 1236; *Teachers Ins. & Annuity Ass'n of Am. v. Ormesa Geothermal*, 791 F. Supp. 401, 415-16 (S.D.N.Y. 1991).

S.D.N.Y. 2007).  That is, courts consider whether the amount due is an unenforceable penalty. *See MarketXT Holdings Corp.*, 276 B.R. at 416.  As the Second Circuit has explained, a prepayment premium is enforceable "where (1) actual damages may be difficult to determine and (2) the sum stipulated is not 'plainly disproportionate' to the possible loss." *United Merchs. & Mfrs.*, 674 F.2d at 142.

In assessing the first criterion, whether actual damages are difficult to determine, courts consider "the loss of interest to the lender, the rate of return on any substitute loan or loans, the duration of that loan . . . , the risk of the substitute loan or loans, and the extent and realizability of the collateral for the substitute loan or loans . . . ." *Vanderveer*, 283 B.R. at 130.  Actual damages "have little relevance to the validity of a liquidated damages clause." *Walter E. Heller & Co. v. Am. Flyers Airline Corp.*, 459 F.2d 896, 898 (2d Cir. 1972).  This is because the "'soundness'" of a prepayment clause "'is tested in light of the circumstances existing as of the time that the agreement is entered into rather than at the time that the damages are incurred or become payable.'" *United Merchs. & Mfrs.*, 674 F.2d at 142 (quoting *Walter E. Heller & Co.*, 459 F.2d at 898).

Actual damages are difficult to determine even where loan payments are calculated based on a set formula.  *See Fin. Ctr. Assocs.*, 140 B.R. at 837 (observing that "[s]light differences in formulating similar formulas will, over long periods of time and when applied to large sums of money, result in pre-payment charges of great disparity").  As one court explained, "[a]ctual damages in complicated and sophisticated transactions do not lose their character as difficult to ascertain just because formulas may serve as a useful tool to estimate them." *Id.*

In considering the second criterion, whether the prepayment consideration is "plainly

disproportionate" to the possible loss, prepayment consideration that is calculated so that the lender will receive its bargained-for yield satisfies this test. *See Vanderveer*, 283 B.R. at 130; *Fin. Ctr. Assocs.*, 140 B.R. at 837-38. This is because when there has been "an arms-length transaction between adequately represented sophisticated businessmen . . . it would be offensive to the basic notion of freedom of contract . . ." to allow the borrower to "gamble with lenders' money regarding the discount rate applicable to pre-payment charges." *Fin. Ctr. Assocs.*, 140 B.R. at 837-38. And prepayment consideration calculated on the basis of U.S. Treasury bond interest rates satisfies the second criterion. *See Saint Vincent's Catholic Med. Ctrs. of N.Y.*, 440 B.R. at 594; *Vanderveer*, 283 B.R. at 130-31.

### *Whether the Lender Is Entitled to Prepayment Consideration*

The Debtor argues that the prepayment provisions in the Note and Mortgage do not require it to pay prepayment consideration to the Lender. This is because the prepayment provisions in Article 5 of the Note and Section 9.3 of the Mortgage require actual payment to trigger the Lender's right to prepayment consideration. The Debtor states that prepayment consideration is not due here because it did not attempt to prepay the loan before filing this bankruptcy case, and its Plan proposes to repay the loan in accordance with the pre-acceleration maturity date. And the Debtor contends that the Lender lost its right to prepayment consideration when it accelerated the debt.

The Debtor also argues that a lender may not recover prepayment consideration under New York law or the Bankruptcy Code when the amount sought is grossly disproportionate to the lender's actual damages. The Debtor contends that prepayment consideration is barred by Section 502(b)(2) because it is unmatured interest, and by Section 506(b) because the Lender is

undersecured.  Finally, the Debtor distinguishes *Vanderveer* on grounds that there, the debtor was solvent and if liquidated would have paid the prepayment fee in full, but here the creditors will not be paid in full.  The Debtor also distinguishes *Vanderveer* on grounds that the court did not consider whether Section 502(b)(2) barred the claim.

The Lender argues that prepayment consideration is provided for under the plain language of the Loan Documents, that under New York law prepayment consideration is valid as liquidated damages, and that bankruptcy courts in this Circuit and elsewhere have allowed such claims.  The Lender states that as a result of Section 9.3 of the Mortgage and the foreclosure proceedings, it was "entitled to recover the prepayment consideration as of the petition date because the Debtor had an obligation to pay the prepayment consideration to redeem the property from the Loan."  LFOF ¶ 25.  It asserts that under New York law, a "foreclosure judgment sets forth a dollar amount that the borrower is required to pay to redeem the property prior to the foreclosure sale" and "[i]f a loan provides for a prepayment fee and prohibits the borrower from evading the prepayment fee by tender of payment in foreclosure, the foreclosure judgment must include the prepayment consideration."  LFOF ¶ 26.

The Lender also argues that under the Bankruptcy Code it is entitled "to include in its Claim all amounts outstanding under the Loan, including the prepayment consideration, even though the amount of the prepayment consideration had not yet been 'liquidated' or reduced to judgment in the foreclosure action."  LFOF ¶ 30.  And the Lender contends that the majority of courts have found that prepayment consideration is not unmatured interest under Section 502(b)(2) where, as here, the claim accrued prepetition.

The parties' prepayment agreement is set forth in Article 5 of the Note and Section 9 of

the Mortgage. Article 5 states that the Debtor has the option, after a two-year no-call period, to prepay the debt provided that it also pays prepayment consideration. Section 9.3 states that any tender of the full amount of the debt by the Debtor after default and acceleration is deemed an evasion of the Debtor's obligation to pay prepayment consideration, and that if such tender is made, the Debtor will be required to pay prepayment consideration or its equivalent.

Here, prepayment consideration is not due under Article 5 of the Note because the Debtor defaulted but did not attempt to prepay the Loan. Indeed, it appears that the Lender accelerated the debt during the no-call period, at a time when prepayment by the Debtor would have been prohibited. And prepayment consideration is not due under Section 9.3 of the Mortgage because the Debtor has not tendered the full amount of the debt to the Lender.

Viewed another way, the Debtor has not prepaid the loan and the parties' agreement does not make prepayment consideration due upon default and acceleration alone. Article 3 of the Note, the default and acceleration provision, does not provide that prepayment consideration is due upon default and acceleration. And Section 9.3 of the Mortgage makes prepayment consideration due only when the Debtor or someone on the Debtor's behalf "makes a tender of payment of the amount necessary to satisfy the Debt . . . ." Mortg. § 9.3. That provision does not make prepayment consideration due upon satisfaction of the debt by another party, such as a third-party purchaser at a foreclosure sale, or when less than the full amount of the debt is paid. The function of Section 9.3 is to protect the Lender against an attempt by the Debtor to evade the prepayment terms of Article 5 by defaulting and tendering payment after acceleration. But it does not compensate the Lender where the Debtor defaults, the Lender accelerates the Loan, and an unrelated party satisfies the debt.

33

This conclusion is consistent with the default and acceleration provision of the Note. Article 3 does not refer to prepayment consideration when defining the "Debt" that becomes due after acceleration by the Lender. And if prepayment consideration was included in the balance due following acceleration, then Section 9.3 of the Mortgage, which provides that prepayment consideration is due if the Debtor tenders payment after acceleration, would be superfluous.[9]

For these reasons, and based on the entire record, the Lender's claim for $7,481,655.87 in prepayment consideration is not allowed.

The Debtor's Objection to Special Servicer Fees

An oversecured creditor is entitled to recover its "reasonable fees, costs, or charges" under Bankruptcy Code Section 506(b). And the Second Circuit has held that an undersecured creditor may recover its post-petition costs based on an enforceable prepetition agreement under Section 502. *See Ogle*, 586 F.3d at 147 (allowing creditor an unsecured claim for post-petition attorneys' fees authorized by a prepetition contract after finding that such claims were not barred by Section 506(b)); *United Merchs. & Mfrs.*, 674 F.2d at 137 (allowing unsecured creditors the right to file claims for collection costs and liquidated damages where prepetition loan agreements provided for such costs and damages).

As explained by one court, "[s]o long as the right to collect the fees existed pre-petition,

---

[9]  As the Lender is not entitled to prepayment consideration under the parties' agreement, it is not necessary to consider whether the amount sought is permitted as liquidated damages or prohibited by Bankruptcy Code Sections 502(b)(2), 506(b), or otherwise. *See, e.g.*, *Ogle*, 586 F.3d at 146 (noting that "'[a] claim will be deemed to have arisen pre-petition if the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation – a right to payment – under the relevant non-bankruptcy law'") (quoting *Manville Forest Prods. Corp.*, 209 F.3d at 129).

the fact that the fees were actually incurred during the postpetition period is not relevant to the determination of whether the creditor has an allowable pre-petition claim for the fees." *In re New Power Co.*, 313 B.R. 496, 508 (Bankr. N.D. Ga. 2004). That is, "[w]hen a creditor's right to payment for fees exists pre-petition, the right to payment constitutes a 'claim,' within the meaning of § 101(5)(A), albeit an unliquidated, unmatured claim that may be estimated for purposes of allowance, if necessary, pursuant to § 502(c)." *New Power Co.*, 313 B.R. at 508. *See In re SNTL Corp.*, 571 F.3d 826, 843-44 (9th Cir. 2009) (same).

Collection costs may be recovered under New York law if they are provided for in the parties' agreement, and are proven by the creditor. *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 72 A.D.3d 409, 412 (N.Y. App. Div. 1st Dep't 2010) (finding that the plaintiff was entitled to reasonable special servicer expenses if proven).

### *Whether the Lender Is Entitled to $290,000 in Special Servicer Fees*

Section 20.1 of the Mortgage states that the Debtor is responsible for the special servicer's fees and expenses while the loan is being serviced. The Debtor and the Lender stipulate that these fees are approximately $6,000 per month, and the parties also agree that payments to the special servicer began in January 2009. The Debtor does not appear to object to the Lender's claim to recover the fees of the special servicer to some extent, but the Debtor objects to the Lender's claim for anticipated aggregate fees of $290,000.

The Lender argues that "the language of the Mortgage determines what charges are recoverable." LFOF ¶ 39. The Lender states that as of August 23, 2010, it has paid over $120,000 in post-petition fees to the special servicer, and these charges continue to accrue. The Lender bases its estimate of $290,000 on the "substantial length of time of a typical foreclosure

proceeding in Kings County, the added delay of an intervening bankruptcy filing, and the additional time required to pursue a deficiency judgment and collection efforts regarding same . . . ." Obj. ¶ 35. According to the Lender, costs and expenses are incurred in connection with on-site property inspections and attendance at court proceedings, depositions, and settlement conferences. And the Lender argues that under these circumstances, $290,000 is a reasonable estimate of its anticipated fees and expenses, and should be allowed.

Here, the Lender is entitled to recover its special servicer fees of approximately $6,000 per month pursuant to the Loan Documents. And it is uncontested that as of August 23, 2010, the Lender had paid some $120,000 in such fees to the special servicer. The Lender seeks an additional $170,000 in anticipated special servicer fees and expenses, which corresponds to more than 28 additional months, through approximately the end of 2012, or a lesser period plus expenses.

The Lender is entitled reasonably to anticipate the elements of its claim, including the fees and expenses that it will be required to pay to the special servicer, whether through the confirmation of a plan of reorganization or otherwise. But at this stage in the proceedings, the Court is not prepared to assume that this case will remain open through the end of 2012, or that the special servicer will incur expenses at a level necessary to support a $290,000 claim. Rather, it seems appropriate to limit the Lender's claim for recovery of fees and expenses paid to the special servicer for a period to include an additional six months, through December 2011, plus reasonable expenses. If unforeseen circumstances lead to this case remaining open beyond that time, the Lender may file an amended proof of claim to seek an appropriate additional sum.

Accordingly, for these reasons, and based on the entire record, the Lender's claim for

$290,000 in special servicer fees is allowed to the extent of $218,000, and not allowed to the extent of $72,000. If the Lender's payments exceed that amount, the Lender may seek an adjustment at the appropriate time.

### Conclusion

For the reasons stated herein, and based on the entire record, the Lender's claim for default interest is allowed, its claim for prepayment consideration is not allowed, and its claim for the special servicer fee is allowed to the extent of $218,000. An order in conformity with this Memorandum Decision shall be entered simultaneously herewith.

Dated: Brooklyn, New York
      June _**27**_, 2011

                                    _**S/ Elizabeth S. Stong**_
                                    HONORABLE ELIZABETH S. STONG
                                    UNITED STATES BANKRUPTCY JUDGE