UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:

               SOUTH SIDE HOUSE, LLC,

                          Debtor.

----------------------------------------------------------------x

Chapter 11

Case No. 09-43576

## MEMORANDUM DECISION ON THE STATUS AND APPLICATION OF THE POST-PETITION RENTS GENERATED BY THE DEBTOR'S PROPERTY

Appearances:

Leo Fox, Esq.
Stephanie Park, Esq.
630 Third Avenue, 18th Floor
New York, NY 10017
   *Attorneys for South Side House, LLC*

McCARTER & ENGLISH, LLP
Joseph Lubertazzi, Jr., Esq.
Peter Knob, Esq.
245 Park Avenue, 27th Floor
New York, NY 10167
   *Attorneys for U.S. Bank National*
   *Association, as Trustee*

**HONORABLE ELIZABETH S. STONG**
**UNITED STATES BANKRUPTCY JUDGE**

## Introduction

Not every dispute concerning the nature and extent of a secured creditor's claim arises in the context of an objection to claim. In this single asset real estate case, South Side House, LLC, has used the substantial rental income generated by a mixed-use commercial property to make adequate protection payments every month to its secured creditor. Now, after a nine-day contested confirmation hearing, it is necessary to answer certain questions that arise from those payments, before the larger question of plan confirmation can be addressed. First, does this rental income belong to South Side, or did the debtor cede it to the lender when it entered into an assignment of rents? And second, how should these payments, which amount to millions of dollars, be applied to the lender's claim?

The Court first considers whether the post-petition rental income generated by the Debtor's property (the "Rents") are property of the estate and cash collateral. To make this determination, the Court must start with New York law, which defines the property interests of borrowers and lenders under assignments of rent, and then consider whether the Debtor's prepetition property interests in the Rents meets the definition of property of the estate under Bankruptcy Code Section 541(a). These determinations also implicate the Debtor's proposed use of the Rents to pay administrative expenses and to fund its Chapter 11 plan of reorganization (the "Plan").

The Court next considers how the Debtor's monthly payments to the Lender from the Rents should be applied to the Lender's claim. This determination requires consideration of the treatment of secured claims under Bankruptcy Code Section 506 and the security interest created by Section 552(b). It also implicates the obligations of single asset real estate debtors under

Section 362(d)(3).

The Debtor owns and operates a mixed-use building with 74 residential units and two commercial units in Williamsburg, Brooklyn (the "Property").  The Lender is the Debtor's largest creditor and holds a commercial mortgage loan made to the Debtor in the principal amount of $29 million.  In connection with that loan, the Debtor entered into a Note, Mortgage, and Other Security Documents (the "Loan Documents").  The Mortgage includes rent and lease assignment terms (the "Assignment of Rents").

This case was filed on April 30, 2009.  Starting in June 2009, and each month thereafter, the Debtor made monthly payments of approximately $151,000 to the Lender from the Rents, and also made a payment of $250,000 in May 2011.  As of December 31, 2011, the net payments, after subtracting amounts applied to real estate taxes, exceed $4.6 million.

The Debtor argues that the Rents are property of the estate that may be used as cash collateral to fund the Plan and to pay professional fees, among other uses.  The Debtor contends that it has a property interest in the Rents under New York law, that rents are treated as cash collateral under the Bankruptcy Code, that the Lender stipulated to this treatment of the Rents in the cash collateral orders entered during the pendency of this bankruptcy case, and that if the Plan is confirmed, the Lender's lien on the Rents will be modified under Bankruptcy Code Sections 1141 and 1129 and any interest that the Lender may have in the Rents will be extinguished.

According to the Debtor, the payments should be applied first to the Lender's unsecured claim, then to post-petition interest and the principal amount of the Lender's secured claim.  The Debtor states that when the Rents are applied in this way, as of June 29, 2010 the Lender's

unsecured claim was paid in full, and as of August 2010 the Lender became an oversecured

creditor entitled to post-petition interest under Section 506(b) at the non-default contract rate.

And the Debtor argues that when the payments are applied in this way, the Lender's remaining

claim as of December 31, 2011 is $28,520,747.

The Lender argues that the Rents are not property of the estate, whether or not the

Assignment of Rents is absolute, because its affirmative steps to enforce the assignment left the

Debtor with only a "reversionary interest" or "a right to the Rents . . . in the event the Loan is

repaid in full."  Lender's Br. ¶ 12, ECF No. 378.  The Lender contends that this interest is

insufficient for the Rents to be considered property of the estate under Section 541.  The Lender

argues that if the Rents are not property of the estate, then it has an absolute right to them and is

entitled to "dictate[] their use."  Lender's Br. ¶ 11.  And the Lender does not consent to the use

of the Rents to fund the Plan or to pay professional fees.

The Lender agrees that when the Rents are turned over to it, they must be applied to the

debt.  But according to the Lender, the Rents should first be applied to the post-petition interest

due on its claim and not to its unsecured claim.  The Lender argues that it was entitled to post-

petition interest before the August 2010 date designated by the Debtor, and that the monthly

interest on its claim is roughly equivalent to the monthly payments from the Rents, so that those

payments do not reduce its claim.  The Lender contends that the Debtor's argument creates a

"perverse incentive" for single asset real estate debtors to delay their cases to the detriment of

mortgagees and in contravention of the purposes of Section 362(d)(3).  Lender's Br. ¶ 32.

Finally, the Lender argues that it is entitled to pendency interest at the default rate provided in

the Loan Documents.

Based on the entire record, and for the reasons stated below, the Court finds that the Rents are property of the estate and the Lender's cash collateral. The Court also finds that the payments made from the Rents during the pendency of the bankruptcy case should be applied first to the Lender's unsecured claim until it is reduced to zero, and then to the post-petition interest, fees, costs, and charges allowed under Section 506(b), and finally to principal.

## Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 157(b)(2)(K) and (M).

## Background

The loan at issue in this proceeding has been the subject of litigation for several years. The Debtor defaulted under the Loan Documents by not making the full monthly payments due from September 10, 2008 through December 10, 2008, and in January 2009, the Lender accelerated the debt and brought a foreclosure action in the United States District Court for the Eastern District of New York. The District Court entered an order appointing a receiver on February 11, 2009, granted the Lender's motion for summary judgment on April 24, 2009, and scheduled a conference to address the appointment of a referee. On April 30, 2009, the Debtor filed for relief in this Court under Chapter 11 of the Bankruptcy Code. As a result of the Debtor's bankruptcy case, the foreclosure proceeding was automatically stayed under Bankruptcy Code Section 362(a), and a referee was not appointed.

The Debtor has operated its business and managed its property as a debtor in possession since the petition date. In its bankruptcy schedules, the Debtor lists two secured creditors, the Lender and Broadway Bank, which holds a second mortgage on the Property. The Debtor

schedules the Lender's claim as $29 million, and Broadway Bank's claim as $1.5 million. The Debtor also schedules two unsecured nonpriority claims totaling $24,200.

Six creditors filed proofs of claim, including the Lender, Broadway Bank, the receiver, and the receiver's counsel. The unsecured creditors listed on the Debtor's schedules did not file proofs of claim, but voted in favor of the Plan. The claims of the receiver and his counsel were resolved by Order dated September 22, 2009. And Broadway Bank's claim of some $1.5 million is treated without objection as unsecured under the Plan. As such, the Debtor's principal creditor, and the only creditor to oppose confirmation of the Plan, is the Lender.

The Debtor and the Lender have engaged in extensive litigation throughout this case. Among other things, the Lender objected to the use of the Rents as cash collateral and moved for relief from the automatic stay and to dismiss this case, and the Debtor objected to the Lender's claim. The Debtor's objection to claim is addressed in a Memorandum Decision of the Court. *See In re South Side House, LLC*, 451 B.R. 248 (Bankr. E.D.N.Y. 2011), *aff'd sub nom. U.S. Bank Nat'l Ass'n v. South Side House, LLC*, 2012 WL 273119 (E.D.N.Y. Jan. 30, 2012). In addition, the Lender brought an action against the Debtor's principals to enforce a guaranty of the Debtor's obligations under the Loan Documents, and that action was referred to the Court for proposed findings of fact and conclusions of law. *See U.S. Bank Nat'l Ass'n v. Perlmutter (In re South Side House, LLC)*, 2012 WL 907758 (Bankr. E.D.N.Y. Mar. 16, 2012).

*Cash Collateral*

At the outset of this case, the Debtor sought authorization to use the Rents as cash collateral pursuant to Bankruptcy Code Section 363 and a direction to the receiver to turn over all leases and rents in its possession pursuant to Section 543. On May 5, 2009, the Court entered

an Order directing the receiver to turn over the Rents and authorizing the Debtor to collect the Rents and manage the Property. That Order also granted interim approval to use the Rents as cash collateral.

As a result of that order, and subsequent orders entered by the Court, the Debtor has been authorized since the first week of the case to use the Rents to maintain the Property as provided in a budget, to pay taxes and insurance, and to make post-petition payments to the Lender. The Lender filed an objection and supplemental objection to the Debtor's application to use cash collateral. And after a hearing on May 21, 2009, an Order authorizing the use of cash collateral through September 30, 2009, was entered without objection (the "Cash Collateral Order").

The Cash Collateral Order states that "[t]he Rents, together with any other income, receipts or revenues received by the Debtor, constitute cash collateral of the Lender and Broadway Bank within the meaning of Section 363(a) of the Bankruptcy Code . . . ." Cash Collateral Order ¶ H, ECF No. 51. It directs the Debtor to make monthly payments of $155,000 to be used by the Lender for real estate taxes and insurance, "with the balance to be applied to the indebtedness, as ultimately directed by the Court or as agreed by the parties." Cash Collateral Order ¶ 8. It also provides that as adequate protection, the Lender and Broadway Bank will receive replacement liens on and security interests in the Rents received by the Debtor.

The Lender has consented to the extension of these terms for the use of cash collateral throughout the pendency of this bankruptcy case. But on April 25, 2011, it filed an objection to the Debtor's application to extend permission to use cash collateral, as well as a cross-motion for remittance of the Rents. In that objection, the Lender argues that the Rents are not property of the estate because they were absolutely assigned to it, and that even if the assignment is not

absolute, the Lender took sufficient prepetition steps to make the assignment enforceable. As a result, the Lender argues, the Debtor may use the Rents only for purposes to which the Lender consents.

After further hearings, the use of cash collateral was extended by Stipulation and Order dated May 11, 2011. That Stipulation and Order required the Debtor to turn over $250,000 in excess funds to the Lender. The Lender has consented to further extensions of cash collateral use, and as of December 31, 2011, the Debtor has paid $5,091,968.30 to the Lender pursuant to these orders. Of this amount, $415,683.42 was used to pay real estate taxes, leaving a net payment to the Lender of $4,676,284.88. On consent, the Debtor's use of cash collateral has been extended to August 31, 2012.

_The Lender's Claim_

On June 17, 2009, the Lender filed a claim in the amount of $36,833,639.68. That claim consisted of $29 million in principal, $911,677.36 in non-default interest from October 10, 2008 to the petition date, $688,750 in default interest from November 11, 2008 to the petition date, $5,954,395.26 in prepayment consideration, $290,000 representing the fees and expenses anticipated to be paid to the special servicer, and other charges, less certain credits. In an attachment to its proof of claim, the Lender states that "[p]ayments made subsequent to the date of the bankruptcy petition will result in a credit to the Debtor." POC 1-1(2) ¶ 15. The Debtor objected to the prepayment consideration, the default interest, and the special servicer fees. On June 27, 2011, the Court issued a Memorandum Decision on the claim objection, allowing default interest, disallowing the prepayment consideration, and allowing the special servicer fees to the extent of $218,000. This decision was affirmed on January 30, 2012.

On August 8, 2011, the Lender filed an amended claim in the amount of $38,612,773.29. The amended claim includes post-petition attorney's fees of $411,360.48 and special servicer fees of $218,000, and amends the prepayment consideration amount while noting that allowance of the prepayment consideration is the subject of an appeal.  The Lender states in an attachment to the amended proof of claim that "[t]o the extent that" the collateral "is insufficient to satisfy [the Lender's] claim, it is an unsecured claim," but does not indicate whether the claim is oversecured or undersecured.  POC 1-2(2) ¶ 11.  And the Lender states in the attachment that "[p]ayments made subsequent to the date of the bankruptcy petition will be credited to the Debtor."  POC 1-2(2) ¶ 9.

On August 9, 2011, the Debtor objected to the Lender's amended claim.  On September 2, 2011, the Lender responded to the Debtor's objection, and on September 13, 2011, the Debtor filed a reply.

_Valuation of the Property_

From time to time during the pendency of this case, the parties have submitted valuations of the Property.  On November 3, 2010, the Court issued a Pre-Hearing Order and a Mediation Referral Order with respect to valuation of the Property.  Soon thereafter, the Lender proposed to stipulate to a value of $29 million for the Property, as stated in an appraisal submitted by the Debtor.  The Debtor responded that the value of the Property for purposes of confirmation should be fixed at $27.4 million.

On February 1, 2011, the Debtor filed a Statement of Valuation of Collateral and Additional Proffer for Confirmation, agreeing that for the purposes of confirmation, the Lender's secured claim is equal to $29 million.  And in their joint statement for confirmation (the "Joint

Statement"), the parties stipulate "that the value of the Collateral is and was throughout the Chapter 11 case and for confirmation purposes, either equal to or less than" $29 million, and the Debtor "contends the value of the Real Property is $27,400,000." Joint Statement ¶ 14, ECF No. 260. The parties also stipulate that the "Debtor is insolvent in that its liabilities exceed its assets." Joint Statement ¶ 13.

On November 30, 2011, the Lender moved to amend the Joint Statement and contest the value of the Property at the confirmation hearing. The Lender states that a recent appraisal values the Property at $34 million. That motion was denied without prejudice to the Lender offering testimony and evidence on value, subject to objection by the Debtor. The Lender did not offer evidence as to the value of the Property during the confirmation hearing.

*The Debtor's Plan and the Confirmation Hearings*

On August 28, 2009, the Debtor moved to extend the exclusivity period to file a plan. That motion was granted without objection on September 22, 2009, and on October 15, 2009, the Debtor filed its first plan of reorganization. On that same day, the Court again extended the exclusivity period. On November 17, 2009, the Debtor filed a plan and disclosure statement, and on January 14, 2010, the Debtor filed an amended plan and disclosure statement. On March 1, 2010, the Debtor filed another amended plan and disclosure statement.

The Court approved the Debtor's disclosure statement without objection on March 15, 2010. On August 12, 2011, shortly before the start of the confirmation hearings, the Debtor filed the Plan. The Plan provides for payment to three classes of claims and interests. Class 1 consists of the allowed secured claim of the Lender, Class 2 consists of allowed unsecured claims, and Class 3 consists of the equity interests of the Debtor. The claims in Class 2 are

Broadway Bank's claim of some $1.5 million, any deficiency claim of the Lender, and $17,000 in claims made by the Debtor's contractors.

The Plan is funded in part by contributions from the Debtor's principals. These include a $200,000 payment to the Lender, $250,000 for any renovations required on the building, and the amount necessary to pay the Debtor's attorneys' fees in excess of $250,000. The Plan also provides that the Debtor will make payments of some $150,000 per month from the Rents to the Lender. And the Plan contemplates that the Debtor will receive a credit for the payments that it made to the Lender from the Rents during the case.

The Lender objects to the Plan on several grounds, including that it is not feasible, does not satisfy the cramdown requirements of Bankruptcy Code Section 1129, and includes an impermissible release of the Debtor's principals. The Lender also argues that post-petition payments made from the Rents do not reduce its claim, and that the Debtor cannot use the Rents to fund the Plan because they are not property of the estate.

Trial on the confirmation of the Plan took place over eight days from August 12, 2011 to January 4, 2012, and the record remains open for the parties' post-trial submissions and other matters.

*The Assignment of Rents*

The Assignment of Rents term is found in Sections 1.2 and 3.7 of the Mortgage. The Mortgage provides:

> Borrower hereby absolutely and unconditionally assigns to Lender Borrower's right, title and interest in and to all current and future Leases, Rents, Lease Guaranties and Bankruptcy Claims; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Nevertheless, subject to the terms of this Section 1.2 and Section 3.7 Lender grants to Borrower a revocable license to collect and receive

10

the Rents, Lease Guaranties and Bankruptcy Claims.  Borrower shall hold the
Rents, Lease Guaranties and Bankruptcy Claims or a portion thereof sufficient to
discharge all current sums due on the Debt, for use in the payment of such sums.

Mortg. § 1.2.  The Mortgage states that the "[b]orrower does hereby absolutely and

unconditionally assign to Lender, Borrower's right, title and interest in all current and future

Leases and Rents" and that the "Lender grants to Borrower a revocable license to operate and

manage the Property and to collect the Rents."  Mortg. § 3.7(a).  And it states that "[u]pon an

Event of Default, without the need for notice or demand, the license granted to Borrower herein

shall automatically be revoked, and Lender shall immediately be entitled to possession of all

Rents, whether or not Lender enters upon or takes control of the Property."  Mortg. § 3.7(a).

The Mortgage also provides that "[s]uch assignment to Lender shall not be construed to

bind Lender to the performance of any of the covenants, conditions or provisions contained in

any such Lease or otherwise impose any obligation upon Lender."  Mortg. § 3.7(a).  Under a

section entitled "Conditions to Grant," the Mortgage provides that if the Debtor "shall well and

truly pay to Lender the Debt at the time and in the manner provided in the Note and this Security

Instrument" and "comply with each and every covenant and condition set forth herein and in the

Note, these presents . . . shall cease, terminate and be void."  Mortg. at 4.  That is, the Mortgage

provides that the Assignment of Rents is one of the "presents" that "shall cease" upon payment

of the Debt.

*                    *                    *

On January 20, 2012, the Debtor filed its Memorandum of Law on the Application of

Adequate Protection Payments, on February 14, 2012, the Lender filed its Memorandum of Law

Regarding the Debtor's Request to Use the Rents to Fund Its Plan of Reorganization and

11

Application of Post-Petition Payments, and on February 29, 2012, the Debtor filed its Reply

Memorandum on Application of Adequate Protection Payments.  On March 6, 2012, the Court

held a hearing at which the Debtor and the Lender appeared by counsel and were heard, and the

Court reserved decision.  On May 24, 2012, the Lender submitted additional authority, and on

May 25, 2012, the Debtor filed a letter in response.

### Discussion

The Court first addresses whether the Rents are property of the estate under Bankruptcy

Code Section 541(a) and cash collateral under Sections 363(a) and 552(b).  The Court next

addresses how the Debtor's post-petition payments to the Lender from the Rents should be

applied to the Lender's claim.

*Whether the Rents Are Property of the Estate and the Lender's Cash Collateral*

To determine whether the Rents are property of the estate and the Lender's cash

collateral, the Court must start with New York law, which defines the property interests of

borrowers and lenders under assignments of rent, and then consider whether the Debtor's

prepetition property interests in the Rents meets the definition of property of the estate under

Section 541(a).  The Court also discusses the security interest created by Section 552(b) in post-

petition rental income, and the statutory framework for the use of cash collateral, including the

requirement of adequate protection.

Property of the Estate  When a bankruptcy petition is filed, an estate is created and the

debtor's property becomes part of the bankruptcy estate.  Bankruptcy Code Section 541(a)(1)

defines property of the estate to include "all legal or equitable interests of the debtor in property

as of the commencement of the case."  11 U.S.C. § 541(a)(1).  *See United States v. Whiting*

12

*Pools*, 462 U.S. 198, 203, 205 (1983) (stating that "all the debtor's property must be included in the reorganization estate").  Courts look to state law or other applicable nonbankruptcy law to determine whether a debtor has a prepetition interest in property, including rents.  *See Butner v. United States*, 440 U.S. 48, 55 (1979) (stating that "[p]roperty interests are created and defined by state law"); *First Fid. Bank v. Jason Reality, L.P. (In re Jason Realty, L.P.)*, 59 F.3d 423, 427 (3d Cir. 1995) (explaining that interests under rent assignment clauses are determined by state law); *Taub v. Taub (In re Taub)*, 427 B.R. 208, 219 (Bankr. E.D.N.Y. 2010) (stating that "[w]hether or not a debtor has an interest in property sufficient to bring it within the ambit of 'property of the estate' is determined by state law or other applicable nonbankruptcy law") (internal quotations marks omitted), *aff'd*, *In re Taub*, 2011 WL 1322390 (E.D.N.Y. Mar. 31, 2011); *In re Dreier LLP*, 429 B.R. 112, 125 (Bankr. S.D.N.Y. 2010) (stating that absent an overriding federal policy, "[s]tate law or other applicable non-bankruptcy law normally determines the extent of the debtor's interest in property").

Courts define property of the estate broadly.  When a debtor has an interest in property under state law, Section 541(a) determines if that interest is sufficient to bring the property into the estate.  *See, e.g.*, *In re Koula Enters., Ltd.*, 197 B.R. 753, 757 (Bankr. E.D.N.Y. 1996) (citing *In re Prudential Lines Inc.*, 928 F.2d 565, 569 (2d Cir. 1991)).  As explained by the Second Circuit, property of the estate includes "[e]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative." *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008) (internal quotation marks omitted).  *See Brown v. Dellinger (In re Brown)*, 734 F.2d 119, 123 (2d Cir. 1984) (stating that "'all legal and equitable interests of the debtor in property' has been given the broadest possible interpretation").

At the same time, "the estate succeeds to no more interest than the debtor had, and the estate takes its interest subject to the conditions under which the debtor held the interest." *Depoy v. Depoy (In re Depoy)*, 29 B.R. 466, 469 (Bankr. N.D. Ind. 1983). *See French v. Johnson (In re Coomer)*, 375 B.R. 800, 804 (Bankr. N.D. Ohio 2007) (noting that Section 541(a) "places [the debtor's] 'interest' in the bankruptcy estate"); *In re Lally*, 51 B.R. 204, 205 (N.D. Iowa 1985) (finding that "whatever rights a debtor has in property when his bankruptcy petition is filed continue in bankruptcy – no more, no less").

<u>Property Interests in Rents Under New York Law</u>  A rent assignment clause may be a source of additional security for a mortgage loan, or, alternatively, it may create an absolute and unconditional assignment. *See, e.g.*, *Fin. Ctr. Assocs. of E. Meadow, L.P. v. TNE Funding Corp. (In re Fin. Ctr. Assocs. of E. Meadow, L.P.)*, 140 B.R. 829, 832 (Bankr. E.D.N.Y. 1992) (noting that "[t]he case law distinguishes between these two different types of assignment"). When an assignment is for additional security, the lender has a lien on the rents, but title to the rents remains with the borrower. But when an assignment is absolute, title to the rents vests in the lender upon execution of the agreement, and the borrower is granted a revocable license to collect the rents that may terminate immediately and permanently upon default. *See, e.g.*, *Jason Realty*, 59 F.3d at 427-29 (discussing New Jersey law).

While some courts have found rent assignments to be absolute under New York law, "the majority of New York state cases are of the view that an absolute assignment is not permitted, regardless of the language in the agreement." *Soho 25 Realty, LLC v. Bank of Am. (In re Soho 25 Realty, LLC)*,  2011 WL 1333084, at *6 (Bankr. S.D.N.Y. Mar. 31, 2011). This majority view is based on New York's "lien" theory of mortgages. Under the lien theory, a mortgage

creates a lien but does not transfer title to the mortgagee.  *See Maspeth Fed. Sav. & Loan Ass'n v. 47-78 Douglass St., LLC (In re 47-78 Douglass St., LLC)*, 2011 WL 2551294, at *2 (Bankr. S.D.N.Y. June 27, 2011); *Dream Team Assocs., LLC v. Broadway City, LLC*, 2003 WL 21203342, at *2 (N.Y. Civ. Ct. N.Y. Co. May 7, 2003).

This theory replaced the earlier common law "title" theory, under which a mortgage was viewed as "a legal conveyance of the fee to the mortgagee."  *1180 Anderson Ave. Realty Corp. v. Mina Equities Corp.*, 95 A.D.2d 169, 172-73, 465 N.Y.S.2d 511, 513-14 (N.Y. App. Div. 1st Dep't 1983) (explaining that "[e]arly in the 19th century the courts of New York came to recognize that a more accurate appraisal of the mortgagor-mortgagee relationship was that of debtor-creditor").  *See Ganbaum v. Rockwood Realty Corp.*, 62 Misc. 2d 391, 394, 307 N.Y.S.2d 436, 439 (N.Y. Sup. Ct. Bronx Co. 1970) (stating that "[t]he common law doctrine that the mortgagee held title thereto . . . has long been abolished").  Under the lien theory, a rent assignment clause under New York law acts "merely as a pledge of rents, not as a direct conveyance."  *641 Ave. of Ams. Ltd. P'ship v. 641 Assocs.*, 189 B.R. 583, 590 (S.D.N.Y. 1995) (noting that "the existence of a separate assignment of rents does not create an automatic conveyance of the rents if the assignment is made as further security for the mortgage debt").

New York courts interpret rent assignment clauses to be additional security even when they contain terms such as "absolute" and "unconditional."  This is because courts look beyond the language used in rent assignment clauses and determine whether the assignment serves to transfer title to the rents to the lender or instead operates as additional security for the mortgage loan.  In other words, "[b]ecause New York operates under a lien theory as opposed to a title theory with respect to mortgages, 'the language used in the assignment instrument itself is not

15

determinative of what rights are actually transferred.'"  *LT Propco, LLC v. Carousel Center Co.*, 68 A.D.3d 1695, 1696, 893 N.Y.S.2d 395, 396 (N.Y. App. Div. 4th Dep't 2009) (quoting *Dream Team Assocs.*, 2003 WL 21203342, at *3).  *See, e.g.*, *Mooney v. Byrne*, 163 N.Y. 86, 91 (N.Y. Ct. App. 1900) (stating that a mortgage "although absolute on its face, when given as security only, is a mortgage by operation of law"); *Suderov v. Ogle*, 149 Misc. 2d 906, 909, 574 N.Y.S.2d 249, 251 (N.Y. Sup. Ct. App. Term 2d Dep't 1991) (stating that "[w]hen a lease is assigned as security for a mortgage, no matter what language is used in the instrument of assignment, no transfer of title to the lease can be effected").

For example, one court found that a rent and lease assignment "was clearly given as security for the mortgage loan despite the fact that the assignment was described as an absolute unconditional assignment."  *Dream Team Assocs.*, 2003 WL 21203342, at *3.  In reaching this conclusion, the court noted that the assignment states "that the lender will no longer have any right to receive the rents upon payment of the loan in full by the borrower," that "the mortgagor will indemnify the mortgagee and hold the mortgagee harmless for any liability which the mortgagee incurs as a result of the leases," and does not state that "the mortgagee [is] a mortgagee in possession or bind the mortgagee to any of the covenants, conditions, or provisions contained in any of the leases."  *Dream Team Assocs.*, 2003 WL 21203342, at *2, *3.[1]

---

[1]  Some courts have found an assignment of rents to be an absolute assignment under New York law.  *See, e.g.*, *In re Loco Realty Corp.*, 2009 WL 2883050, at *5 (Bankr. S.D.N.Y. June 25, 2009) (noting that under present tense assignment, the lender's "title to the rents was not dependent on any default on the part of the Debtor"); *Credit Lyonnais v. Getty Sq. Assocs.*, 876 F. Supp. 517, 521 (S.D.N.Y. 1995) (stating that "where an assignment of rents is a present tense assignment of all rents to be held in trust for the benefit of the mortgage lender, the mortgage lender is entitled to all rents paid to the mortgagor from the date of the mortgagor's default").

When an assignment is for additional security, a mortgagee generally must take certain affirmative steps after default in order to trigger its rights. *See Fin. Ctr. Assocs.*, 140 B.R. at 833 (noting that "full enjoyment of the benefits of the security is not available until additional legal steps are undertaken"). These steps include "appointing a receiver to collect the rents, taking possession of the property, commencing foreclosure proceedings, or seeking an order for sequestration of rents." *641 Assocs.*, 189 B.R. at 591 (citing cases). *See Loco Realty Corp.*, 2009 WL 2883050, at *5 (stating that a "mortgagee's interest in unpaid rents does not become enforceable until either a receiver is appointed or the mortgagee comes into possession of the property") (internal quotation marks and citations omitted); *1180 Anderson Ave. Realty Corp.*, 95 A.D.2d at 173-74, 465 N.Y.S.2d at 514.

But the right to collect rents is not the same as having title to them. Under New York law, the right to enforce an assignment or collect the rents does not confer title. As courts have noted:

> "A mortgagee with a rent assignment has an equitable right to collect, but does not have legal title to rents automatically upon default. Rent is an incident of title which in New York remains in the mortgagor after default and which cannot be conveyed by a rent assignment clause in a mortgage prior to a foreclosure . . . ."

*In re Cerrico Realty Corp.*, 127 B.R. 319, 323 (Bankr. E.D.N.Y. 1991) (quoting *Ryen v. Park Hope Nursing Home, Inc. (In re Flower City Nursing Home, Inc.)*, 38 B.R. 642, 645 (Bankr. W.D.N.Y. 1984)). This follows from the principle that "[t]he entry of a judgment of foreclosure and sale does not divest the mortgagor of its title and interest in the property until the sale is actually conducted." *Bethel United Pentecostal Church, Inc. v. Westbury 55 Realty Corp.*, 304 A.D.2d 689, 692-93, 760 N.Y.S.2d 60, 64 (N.Y. App. Div. 2d Dep't 2003). *See Staples, Inc. v. W.J.R. Assocs.*, 2010 WL 1260191, at *5 (E.D.N.Y. Mar. 30, 2010) (noting that the New York

17

Court of Appeals has found that "a mortgagor-defendant in a foreclosure action retains the right to convey the property until the hammer drops at the foreclosure auction") (citing *Nutt v. Cuming*, 155 N.Y. 309, 309 (N.Y. Ct. App. 1898)).

That is, under New York law, a mortgagee does not acquire title to the rents upon default, after a foreclosure proceeding is initiated, a receiver is appointed, or a judgment of foreclosure of sale is entered. *See, e.g.*, *Prudence Co. v. 160 West Seventy-Third St. Corp.*, 260 N.Y. 205, 211 (N.Y. Ct. App. 1932) (stating that "[r]ight to the rents and profits is merely an incident of ownership of the property which has been pledged as security for the mortgage debt" and that "[t]itle remains in the mortgagor . . . until the lien is foreclosed"); *Greer v. Kittay (In re Temple Court Assocs.)*, 1996 WL 537886, at *4 (S.D.N.Y. Sept. 20, 1996) (stating that "a court cannot, pending sale, terminate the rights of the mortgagor or of the tenants under existing leases") (internal quotation marks omitted); *Soho 25 Retail*, 2011 WL 1333084, at *8 (stating that "[i]n New York the appointment of a receiver in a foreclosure action does not alter title to the property"); *Koula*, 197 B.R. at 758 (stating that when a receiver is appointed "[t]he title remains in those in whom it was vested when the appointment was made") (internal quotation marks omitted).[2]

<u>Rents as Property of the Estate</u>  Bankruptcy Code Section 541(a)(1) accords a broad and encompassing meaning to the concept of property of the estate.  The Bankruptcy Code also

---

[2] Even so, some courts have stated that enforcement of an assignment transfers title to the lender. *See, e.g.*, *Woman's Hosp. in State of N.Y. v. Sixty-Seventh St. Realty Co.*, 265 N.Y. 226, 233 (N.Y. Ct. App. 1934) (stating that "[t]hough the rents were pledged as security under the terms of the first mortgages, title to such rents, as they became due and were collected, remained in the owner of record until the pledge was made effective, and the owner of the equity divested of title to the rents by appointment of a receiver or by assignment").

makes clear that post-petition "proceeds, product, offspring, rents, or profits of or from property of the estate" are also property of the estate.  11 U.S.C. § 541(a)(6).  As explained by the Second Circuit, property acquired after the commencement of the bankruptcy case is generally not considered property of the estate, but under Section 541(a)(6), "after-acquired property will vest in the estate if it is derived from property that was part of the estate at the commencement of the bankruptcy."  *Chartschlaa*, 538 F.3d at 122 (internal quotation marks omitted).  That is, as a general rule, if the debtor retains an interest in the property generating post-petition proceeds, the proceeds from that property are likewise property of the estate.

Where a receiver has been appointed prepetition to collect rents, a debtor may seek authorization to recover the rents collected by the receiver and to collect future rents.  Section 543 requires a receiver or other custodian to deliver to the debtor in possession any rents that are in its possession, custody, or control on the date that the custodian acquires knowledge of the commencement of the case.  11 U.S.C. § 543(b)(1).  But a debtor may only recover prepetition rents under Section 543 if those rents are property of the debtor under applicable nonbankruptcy law.

In *Whiting Pools*, the Supreme Court addressed the boundaries of property of the estate in the context of Section 542, another turnover provision.  There, the IRS had a tax lien on certain property of the debtor, and prior to the debtor's filing, it seized that property under the Internal Revenue Code's levy and seizure provisions.  *Whiting Pools*, 462 U.S. at 210-11.  The Court found that property of the estate includes "property in which the debtor did not have a possessory interest at the time the bankruptcy proceedings commenced."  *Whiting Pools*, 462 U.S. at 205.  The Court noted that the IRS's seizure of the property did not "determine the

19

Service's rights to the seized property, but merely [brought] the property into the Service's legal custody" and that under the Internal Revenue Code, "[o]wnership of the property is transferred only when the property is sold . . . at a tax sale." *Whiting Pools*, 462 U.S. at 211. Because the property had not been sold, it remained subject to turnover. *Id.*

Similarly, courts in this Circuit regularly conclude that prepetition rents are property of the estate, even when the debtor has lost possession of the rents to a receiver. *See, e.g.*, *Temple Court Assocs.*, 1996 WL 537886, at *4-5 (affirming part of bankruptcy court's decision that held that the debtor "retains an ownership interest in pre-petition rents until after the foreclosure sale has occurred"). Courts also find that post-petition rents are property of the estate even after a creditor with a lien on the rents has initiated a foreclosure proceeding and a receiver has been appointed. *See, e.g.*, *Koula*, 197 B.R. at 758 (explaining that "the effect of the appointment of a receiver in the present case was to terminate the Debtor's right to possession of the rents, not to terminate its ownership prior to a judgment of foreclosure and subsequent sale"); *Cerrico Realty Corp.*, 127 B.R. at 323-34 (finding that rents were cash collateral even after initiation of foreclosure proceeding and appointment of receiver).[3]

In a different context, the Second Circuit has held that an equity of redemption and proceeds flowing from it are property of the estate under Section 541. *See Brown*, 734 F.2d at 123-24. In *Brown*, the court found that the debtor "had an equitable interest in the surplus

---

[3] Courts in other circuits reach the same conclusion. *See, e.g.*, *In re Buttermilk Towne Ctr., LLC*, 442 B.R. 558, 564 (B.A.P. 6th Cir. 2010) (stating that "[w]ithout an absolute right of ownership, mere possession cannot divest the debtor of its ownership interest"); *In re Senior Hous. Alts., Inc.*, 444 B.R. 386, 401 (Bankr. E.D. Tenn. 2011) (finding that rents were property of the estate despite rent assignment clause and initiation of foreclosure proceedings); *In re May*, 169 B.R. 462, 471 (Bankr. S.D. Ga. 1994) (stating that "a 'reversionary interest', a 'right of redemption' or the like . . . is an interest which becomes property of the bankruptcy estate").

funds" generated by a foreclosure sale within the meaning of Section 541. *Brown*, 734 F.2d at

123. The court stated that "[t]o the extent that no other creditors had an interest in the residence,

[the debtor] as the owner of the equity of redemption would presumably have been entitled to

have the surplus funds returned to her." *Id.* at 123-24. *See In re 114 Tenth Ave. Assocs., Inc.*,

427 B.R. 283, 295 (Bankr. S.D.N.Y. 2010) (finding that "[s]urplus funds from a pre-bankruptcy

New York State foreclosure sale are property of the estate").[4]

But if a debtor's interest in rents has been terminated prepetition, then upon the

commencement of the bankruptcy case, those rents are not property of the estate. *See, e.g.*,

*Jason Realty*, 59 F.3d at 425 (finding that under absolute assignment, debtor did not have an

ownership interest in rents and the rents were not property of the estate); *Loco Realty*, 2009 WL

2883050, at *5-6 (holding that under an absolute rent assignment, creditor held prepetition title

to rents, and the rents could not be used to fund the debtor's Chapter 11 plan); *R.A. Hendrickson

Real Estate, Inc. v. Weisman (In re R.A. Hendrickson Real Estate, Inc.)*, 395 B.R. 565, 579-80

(Bankr. E.D.N.Y. 2008) (finding that debtor had a right of redemption, but not an interest in the

---

[4] Some commentators argue that a right of redemption should always be sufficient to bring rents into the estate. *See* John J. Rapisardi & Elliot L. Hurwitz, *The Mortgagee's Right to Rents after Default: An Unsettled Controversy*, 6 J. Bankr. L. & Prac. 331, 337 (1997) (stating that "[i]f the equity of redemption is a contingent right that is a part of the debtor's estate in lien and title theory states, then . . . upon commencement of a bankruptcy case . . . rent should remain property of the estate and subject to use as cash collateral . . . ."); Julia Patterson Forrester, *Still Crazy After All These Years: Absolute Assignment of Rents in Mortgage Loan Transactions*, 59 Fla. L. Rev. 487, 521-22 (2007) (stating that "[i]f the borrower has any remaining property rights in the rental stream under state law, bankruptcy law dictates that the rental stream be treated as part of the bankruptcy estate. . . . If rents are unavailable for operation and maintenance of the property, almost no hope of reorganization exists for a borrower in Chapter 11. . . . [and] the borrower's efforts to reorganize under the protection of Chapter 11 will be frustrated even in those cases where a reorganization might otherwise have been successful. This result defeats the policies behind the Bankruptcy Code and Chapter 11, is simply an injustice.").

rents, where creditor's tax lien and treasurer's deed served to terminate debtor's title to the

property).

For example, in *In re Woodmere Investors Ltd. Partnership*, the court found that under

Michigan law, rents were not property of the estate. 178 B.R. 346, 360 (Bankr. S.D.N.Y. 1995).

The court explained:

> Michigan law transfers ownership of the Rents to the mortgagee until the
> Mortgage is satisfied. The equitable interest the Debtor alludes to as property of
> the estate was correctly characterized by [another] court as an equitable interest in
> future rents and not in the present rents. Under Michigan law, the interest revests
> if the mortgagor redeems the Mortgage. However, all rents collected by the
> mortgagee from the time of default to the time of redemption belongs to the
> mortgagee until the Debtor redeems the Property. Until that time, the Rents
> belong to Connecticut Mutual.

*Id.* At least one court applying New York law held that the affirmative steps taken by a creditor

to enforce its rights under an assignment of rents clause left the debtor with an interest in the

rents that was insufficient to make the rents property of the estate. *See Soho 25 Retail*, 2011 WL

1333084, at *8-9 (stating that where a debtor "has only an interest in the rents to the extent a

mortgage is ever satisfied, the cash flow from the rents is not property of the estate until the

mortgage is satisfied") (citing *Loco Realty*, 2009 WL 2883050, at *6). But another court in this

Circuit found that rents were cash collateral even where the assignment was absolute under

Georgia law, because the debtor still retained some interest in the rents. *See Travelers Indem.

Co. v. Grant Assocs. (In re Grant Assocs.)*, 1991 WL 21228, at *4-5 (S.D.N.Y. Feb. 5, 1991).

<u>Rents as Cash Collateral</u>  Several provisions of the Bankruptcy Code protect a secured

creditor's interest in post-petition rental income. While property acquired by the estate after the

commencement of a bankruptcy case is generally not subject to a prepetition lien, Section 552(b)

creates an exception to this rule for liens on post-petition rental income. 11 U.S.C. §§ 552(a),

22

552(b). And under Section 363(a), rents that are subject to a prepetition lien are treated as the secured creditor's cash collateral. 11 U.S.C. § 363(a).

Bankruptcy Code Section 363(c) states that a debtor "may not use, sell, or lease cash collateral" in the ordinary course of business, unless the secured creditor consents or court authorization is obtained. 11 U.S.C. § 363(c)(2). Under Section 363(b), a debtor may use cash collateral other than in the ordinary course of business, subject to objection by the secured creditor under Section 363(e). And Section 363(e) provides that when a creditor objects to a debtor's use of its cash collateral, the bankruptcy court "shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

It is well settled that the debtor bears the burden to demonstrate that a creditor is adequately protected. *See, e.g.*, *In re Constable Plaza Assocs.*, 125 B.R. 98, 104 (Bankr. S.D.N.Y. 1991). When considering adequate protection for the use of rents, courts recognize that Section 552(b) creates a security interest in post-petition rental income that is separate and distinct from the creditor's security interest in the property securing the mortgage. *See In re Gramercy Twins Assocs.*, 187 B.R. 112, 121 (Bankr. S.D.N.Y. 1995). As a result, a creditor "is entitled to adequate protection of two distinct interests: its mortgage on the property and its right to collect the rents flowing from the property or, at the very least, its security interest in such rents." *Fin. Ctr. Assocs.*, 140 B.R. at 834.

Whether a creditor is adequately protected depends on the facts and circumstances of the case. As noted in a leading treatise:

In the context of a request for authorization to use cash collateral under section 363(c)(2), it is unlikely that the creditor will be able to receive the precise

23

equivalent of cash collateral. However, section 363 does not require precise equivalency. The special treatment afforded cash collateral recognizes its unique status as the highest and best form of collateral but also establishes that upon an appropriate showing it can be used if the rights of the secured creditor can be adequately protected. Whether adequate protection may be said to exist will depend on a number of factors, including the value of all collateral, the nature of the proposed use and the value of that which is being offered. While cases are quite varied, substitute liens, equity cushions and operating controls have all been found sufficient.

3 Collier on Bankruptcy ¶ 363.05[3], at 363-42 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012) (citing cases).

In *Constable Plaza Associates*, the court struck a balance between the estate's interest in the rents and the secured creditor's right to collect the rents when considering the debtor's request to use cash collateral. *Constable Plaza Assocs.*, 125 B.R. at 105. The court explained:

The debtor does not now seek unfettered use of the rents, or cash collateral. The debtor would like to collect the rents in order to pay the expenses relating to the operation of its office building. Therefore, any expenses in excess of this proposed use should be turned over to Mutual pursuant to its right to receive or collect the assigned rents. The debtor may use the rents only for the purpose of operating the office building. To this extent, Mutual is adequately protected by the admitted equity cushion between the value of the building and the debtor's obligation to Mutual. Furthermore, the debtor's plowing back rents solely for the purpose of maintaining and operating its office building will serve to preserve or enhance the value of the building which, in turn, will protect the collateral covered by Mutual's mortgage.

*Constable Plaza Assocs.*, 125 B.R. at 105 (internal citations omitted). *See In re R & G Props.*, 2009 WL 2043875, at *6 (Bankr. D. Vt. July 6, 2009) (noting that "[s]ome courts hold that a creditor is adequately protected if the rents are used to pay the operating expenses and required maintenance").

In *Buttermilk Towne Center*, the Sixth Circuit bankruptcy appellate panel held that the bankruptcy court erred in allowing the debtor to use the rents for certain administrative expenses

including professional fees, noting that the creditor's interest in the property and its interest in the rents were separate security interests, and that replacement liens did not adequately protect the secured creditor because the debtor had no unencumbered assets. 442 B.R. at 566-67. The court looked to the Sixth Circuit's decision in *Stearns Building v. WHBCF Real Estate (In re Stearns Building)*, 1998 WL 661071, at *3-4 (6th Cir. Sept. 3, 1998), where the court explained that "it is clear that Debtor must provide adequate protection if it is to use the net rents. However, the record does not indicate that Debtor possesses any unencumbered assets with which it can offer [the lender] adequate protection." 1998 WL 661071, at *4.

Other courts have similarly required rents to be turned over to the secured creditor even after determining that the rents are property of the estate and cash collateral. *See, e.g.*, *641 Assocs.*, 189 B.R. at 589-91 (finding that Chapter 7 trustee was required to turn over rents that were both property of the estate and cash collateral where the bankruptcy court had granted the secured creditor relief from the automatic stay and the property was sold in a foreclosure proceeding); *NationsBank v. LDN Corp. (In re LDN Corp.)*, 191 B.R. 320, 327 (Bankr. E.D. Va. 1996) (declining to authorize use of cash collateral where there were grounds for stay relief).

In sum, under New York law, an absolute assignment of rents is rarely recognized, and a creditor's right to collect rents does not divest a debtor of all of its interests in the rents. Under the Bankruptcy Code, the definition of property of the estate is broad, and includes rents subject to a lien, provided that the debtor did not lose its prepetition title to the rents. And when rents are property of the estate, several provisions of the Bankruptcy Code govern the treatment of those rents, including Sections 361, 363, and 552.

*   *   *

25

The Debtor argues that the Rents are property of the estate under the terms of the Cash Collateral Order and Bankruptcy Code Section 541. The Debtor notes that the Cash Collateral Order states that the Rents constitute cash collateral within the meaning of Section 363(a), and that "[t]he Lender consented to this order more than two and a half years ago." Debtor's Br. ¶ 37, ECF No. 366. The Debtor argues that it is inequitable and improper for the Lender to challenge the Cash Collateral Order at this late stage in the case. And the Debtor states that while adequate protection payments are generally not paid to a creditor until confirmation, the Lender has benefitted over the past two and a half years by receiving significant payments from the Rents.

The Debtor also argues that its interest in the Rents is sufficient to bring them into the estate and to permit their use to fund the Plan. The Debtor states the Rents were not absolutely assigned to the Lender, and that the Rents are property of the estate "because if the mortgage is ever satisfied, the right to rents revests in the Debtor." Debtor's Br. ¶ 41. The Debtor notes that courts have held that the appointment of a receiver does not take rents out of the estate, and argues that *Soho 25 Retail* was wrongly decided.

The Debtor argues that the Lender's sole basis to claim that its prepetition conduct renders the assignment absolute is the District Court foreclosure proceeding and the appointment of a receiver. The Debtor states that any decision by the District Court "had no force and effect" because the District Court did not have subject matter jurisdiction. Debtor's Br. ¶ 51. The Debtor contends that there is no diversity jurisdiction, and there was no "related to" jurisdiction until it filed its bankruptcy case. Debtor's Br. ¶ 51.

The Lender argues that even if the Assignment of Rents is not absolute, its right to the

Rents became absolute as a result of the affirmative steps it took to assert its interest in them. According to the Lender, "[u]nder New York law, even when rents are pledged as security only, the mortgagee's right to the rents will become absolute if the mortgagor defaults and the mortgagee takes sufficient steps to enforce its interest in the rents." Lender's Br. ¶ 13. The Lender argues that as a consequence of these affirmative steps, "as of the petition date, the Debtor had at most a reversionary interest in the Rents," which is not sufficient to make the Rents property of the estate under Section 541. Lender's Br. ¶ 15. And the Lender argues that its consent to the terms of the Cash Collateral Order does not alter this conclusion, because the Cash Collateral Order contained a reservation of rights and the Court has not determined whether the Rents are property of the estate.

As a result, the Lender argues, "the Rents may not be used by the Debtor without the Lender's consent," and cannot be used to fund the Plan or to pay professional fees. Lender's Br. ¶ 23. And the Lender states that "[w]hile a determination that the Debtor may not use the Rents might frustrate the Debtor's ability to reorganize, the Debtor's desire to reorganize cannot trump the Lender's property rights." Lender's Br. ¶ 23 (citing *Jason Realty*, 59 F.3d at 430 (stating that the "otherwise worthy desire for achieving a reorganization under Chapter 11 should not trump the rights of an assignee of a lease under a pre-petition assignment")).

The Debtor responds that "[a] reversionary interest is not afforded any lesser status; it is still an interest that is property of the estate." Debtor's Reply ¶ 27, ECF No. 387. The Debtor also argues that confirmation of the Plan will extinguish the Lender's lien on the Rents, and that "confirmation of the Plan is imminent." Debtor's Reply ¶ 22. And the Debtor reiterates that the Rents have already been determined to be cash collateral under the Cash Collateral Order.

As an initial matter, the Court must determine the extent of the Debtor's interest in the Rents as of the petition date under the Assignment of Rents and New York law. The starting point for this determination is whether the Assignment of Rents transferred title to the Rents to the Lender at the time it was entered into by the parties. If the assignment is absolute, then the Debtor's interest in the Rents may be insufficient to bring them into the estate under Bankruptcy Code Section 541.

The Assignment of Rents states that it is "intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only." Mortg. § 1.2. It also provides that the "Lender grants to Borrower a revocable license" to collect the Rents, but that upon an event of default "the license . . . shall automatically be revoked, and Lender shall immediately be entitled to possession of all Rents . . . ." Mortg. § 3.7(a). While these terms suggest an absolute assignment, and specifically indicate that the assignment is not for additional security, New York law is clear that a court must look to the context of the agreement to determine the true nature of the assignment. *See LT Propco*, 68 A.D.3d at 1696, 893 N.Y.S.2d at 396; *Suderov*, 149 Misc. 2d at 909, 574 N.Y.S.2d at 251.

The Assignment of Rents is found within a mortgage securing a commercial real estate loan. This context itself indicates that the assignment is in the nature of a pledge of additional security. Consistent with this, the assignment states that the Lender is not bound by the covenants or other obligations in the leases. As one court explained, such terms indicate that an assignment is meant as a pledge of additional security because it is "in direct contrast to a situation where there has been a true unconditional assignment of the lease and rents in connection with a transfer of title with the assignee stepping into all of the rights and obligations

28

of the landlord." *Dream Team Assocs.*, 2003 WL 21203342, at *3 (internal quotation marks omitted).

Moreover, the assignment provides that the Rents revert back to the Debtor when the mortgage is satisfied. Such language shows that the assignment was for additional security, because "[t]he only permissible use" for "rent is to pay down the mortgage and once the mortgage is paid down, the assignment is extinguished." *Dream Team Assocs.*, 2003 WL 21203342, at *3. In light of these terms, the context of the assignment, and New York's "lien" theory, the Court finds that the Assignment of Rents is in the nature of a pledge for additional security only, and not an absolute assignment.

The next question is the extent of the Debtor's interest in the Rents after it defaulted and the Lender took affirmative steps to enforce its rights under the Assignment of Rents. Among other things, the Lender brought a foreclosure action and obtained the appointment of a receiver. These steps were sufficient to trigger the Lender's rights under the Assignment of Rents, including its right to collect the Rents. *See, e.g.*, *641 Assocs.*, 189 B.R. at 591. But the Lender's right to collect the Rents did not divest the Debtor of all of its interests in the Rents.

Under New York law, a borrower retains an interest in rents even after a foreclosure proceeding is initiated and a receiver is appointed to collect the rents. The Debtor's interest includes a reversionary interest in the Rents if the Lender's claim is satisfied before a foreclosure sale, as well as a right to any excess rents that remain if the Lender's claim is satisfied in full by a foreclosure sale. Significantly, while the Lender's affirmative steps are sufficient to give it an enforceable interest in the Rents, the Debtor retains title to them. *See, e.g.*, *Koula*, 197 B.R. at 757 (rejecting the creditor's argument that "under New York law, the appointment of a receiver

29

in a mortgage foreclosure action transfers title to the rents to the bank").

A further question is whether the Debtor's interest in the Rents as of the petition date is sufficient to bring the Rents into the estate under Section 541. It is a fundamental principle of bankruptcy law that the definition of property of the estate is broad and far-reaching. Several courts have found rents to be property of the estate in circumstances where, as here, the secured creditor initiated a prepetition foreclosure proceeding and a receiver was appointed. *See, e.g.*, *Temple Court Assocs.*, 1996 WL 537886, at *4-5; *Koula*, 197 B.R. at 758. This Court likewise finds that although the Lender has an enforceable interest in the Rents, the Debtor retains a prepetition interest in the Rents sufficient to bring them into the estate.

For substantially the same reasons, the Court also finds that the Rents are the Lender's cash collateral pursuant to the Assignment of Rents and Bankruptcy Code Sections 552(b) and 363(a). Because the Rents are cash collateral, they may be used as provided in the Cash Collateral Order for as long as that order remains in effect. To the extent that the Debtor intends to use the Rents for purposes to which the Lender objects, such as the payment of professional fees and other administrative expenses, it will have to meet the standards of Sections 361, 363, and 552 to demonstrate that the Lender's interest is adequately protected. *See, e.g.*, *Constable Plaza Assocs.*, 125 B.R. at 105; *Buttermilk Towne Ctr.*, 442 B.R. at 566-67. Finally, the Debtor's proposed use of the Rents to fund the Plan raises additional issues that should be decided in the context of plan confirmation, including feasibility and the requirement of "fair and equitable" treatment of claims.[5]

---

[5] *See, e.g.*, *In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 479-80 (Bankr. S.D. Ohio 2011) (discussing the debtor's use of pre-confirmation cash collateral in the context of plan feasibility); *In re Mayslake Village-Plainfield Campus, Inc.*, 441 B.R. 309, 322 (Bankr. N.D. Ill.

For these reasons, and based on the entire record, the Court finds that the Rents are property of the Debtor's estate and the Lender's cash collateral.

*How the Debtor's Payments from the Rents Should Be Applied to the Lender's Claim*

The determination of how the Debtor's payments from the Rents should be applied to the Lender's claim requires consideration of the treatment of secured claims under Bankruptcy Code Section 506 and the security interest created by Section 552(b). It also implicates the obligations of single asset real estate debtors under Section 362(d)(3).

Secured Claims under Bankruptcy Code Section 506   Bankruptcy Code Section 506 addresses the secured status of a claim. Section 506(a) provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a)(1). That is, an undersecured creditor will have a secured claim equal to the value of the collateral and an unsecured claim for the balance. As the Supreme Court has

---

2010) (stating that "[t]he net rents being used to pay the Class 7 claim are presently part of the Lender's cash collateral. The effect of paying the Class 7 claim before the Lender's Class 2 and Class 3 claims is to subordinate the Lender's claims" and finding that "the Plan's treatment of the Lender's claims violates the 'fair and equitable' requirement of § 1129(b)(1) and (b)(2)(A)"); *In re Griswold Bldg., LLC*, 420 B.R. 666, 706 (Bankr. E.D. Mich. 2009) (noting that "the Debtors propose to use the Lender's cash collateral to pay claims that have a lower priority under the Bankruptcy Code than the claims of the Lender, without providing any replacement collateral for the Lender" and stating that "[i]t is hard to see how that is fair and equitable"); *Gramercy Twins Assocs.*, 187 B.R. at 126 (finding the debtor's plan not feasible on alternate grounds, including that it did not provide for repayment of cash collateral used to pay administrative fees over the objection of the secured creditor).

explained, "[t]he phrase 'value of such creditor's interest' in § 506(a) means 'the value of the collateral.'" *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 372 (1988) (quoting H.R. Rep. No. 95-595, pp. 181, 356 (1977)).

While the amount of a claim is determined as of the petition date, the Bankruptcy Code does not specify the time period for valuation of collateral, and many courts have adopted a flexible approach. *See, e.g.*, *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 798 (5th Cir. 1997) (observing that a flexible approach to timing of valuation "recognizes the discretionary nature of bankruptcy courts as courts of equity"); *In re SW Hotel Venture, LLC*, 460 B.R. 4, 31-32 (Bankr. D. Mass. 2011) (noting that the flexible approach to valuation has been adopted by a majority of courts). As one court explained, "determining the value of the secured and unsecured portions of the claim is context sensitive . . . ." *In re Sneijder*, 407 B.R. 46, 52 (Bankr. S.D.N.Y. 2009). For example, for purposes of plan confirmation, many courts value the collateral as of a date on or near the date of confirmation. *See, e.g.*, *Planavsky v. County of Broome (In re Planavsky)*, 432 B.R. 481, 485 (Bankr. N.D.N.Y. 2010); *In re Melgar Enters.*, 151 B.R. 34, 39 (Bankr. E.D.N.Y. 1993).

The Bankruptcy Code does not specify which party has the burden of proof in disputes concerning the extent of a creditor's security interest. Some courts have found that the secured creditor bears the burden of proof. *See, e.g.*, *Sneijder*, 407 B.R. at 55. Others have held that the party disputing the extent of the creditor's interest has the burden. *See, e.g.*, *Weichey v. Nextier Bank (In re Weichey)*, 405 B.R. 158, 164 (Bankr. W.D. Pa. 2009). And still others have adopted a burden-shifting approach. Under this approach, the initial burden is on the debtor to rebut "the presumed validity and amount of the creditor's secured claim." *In re Heritage Highgate, Inc.*,

2012 WL 1664174, at *4 (3d Cir. May 14, 2012) (internal quotation marks omitted).  If the presumption is rebutted, the creditor "bears the ultimate burden of persuasion to demonstrate . . . both the extent of its lien and the value of the collateral securing its claim." *Heritage Highgate*, 2012 WL 1664174, at *4 (internal quotation marks omitted).

Bankruptcy Code Section 506(b) addresses certain rights of secured creditors.  It provides:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under [Section 506(c)], is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

11 U.S.C. § 506(b).  Section 506(b) permits an oversecured creditor to receive post-petition interest and other charges, and generally prohibits an undersecured creditor from receiving these benefits.  *See Timbers*, 484 U.S. at 379-82 (holding that an undersecured creditor is not entitled to interest on its claim for lost opportunity costs).  Stated another way, under Section 506(b) and *Timbers*, an undersecured creditor may not receive payment in excess of its original claim.  *See, e.g.*, *In re 354 E. 66th St. Realty Corp.*, 177 B.R. 776, 781 (Bankr. E.D.N.Y. 1995).

As discussed above, under Section 552(b), a creditor has a separate security interest in rental income from its interest in the property securing the mortgage.  As one court stated, "[t]aken together, sections 506(a) and 552(b) require that [the creditor's] post-petition security interest in rents be added to its separate security interest in the Property." *In re Bloomingdale Partners*, 155 B.R. 961, 976 (Bankr. N.D. Ill. 1993).  As a result, if the value of the property remains the same, then the value of the creditor's collateral will increase by the amount of the rental income that is collected by the debtor.  This means that the secured portion of an

undersecured creditor's claim may increase as rental income is collected by the debtor, while the unsecured portion of its claim is reduced by the same amount.

The extent of a creditor's entitlement to interest depends on a variety of factors.  Interest accrued between the filing date and confirmation is referred to as pendency interest.  In this Circuit, there is a presumption that pendency interest should be calculated at the default rate of interest under the parties' agreement, "subject to equitable considerations."  *In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122, 134 (Bankr. E.D.N.Y. 2002).  *See Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.*, 394 B.R. 325, 338 (S.D.N.Y. 2008) (finding that "[t]he great majority of courts to have considered the issue . . . have concluded that post-petition interest should be computed at the rate provided in the agreement, or other applicable law, under which the claim arose – the so-called 'contract rate' of interest" ) (internal quotation marks omitted).

But this presumption is not an entitlement.  *See Key Bank Nat'l Ass'n v. Milham (In re Milham)*, 141 F.3d 420, 423 (2d Cir. 1998).  Courts consider several factors when deciding whether to enforce a contractual default rate or alter it, including:

> (1) The difference between the default and non-default rates; (2) the reasonableness of the differential between the rates; (3) the relative distribution rights of other creditors and whether enforcement of the higher rate will do injustice to the concept of equitable distribution of the estate's assets; and (4) the purpose of the higher interest rate.

*In re Bownetree, LLC*, 2009 WL 2226107, at *4 (Bankr. E.D.N.Y. July 24, 2009).  *See In re Liberty Warehouse Assocs. Ltd. P'ship.*, 220 B.R. 546, 549 (Bankr. S.D.N.Y. 1998).  Other considerations may include whether there has been misconduct by the creditor, whether application of the interest rate would harm the unsecured creditors, whether the interest rate

34

amounts to a penalty, and whether application of the interest rate would interfere with the debtor's fresh start.  *See In re P.G. Realty Co.*, 220 B.R 773, 780 (Bankr. E.D.N.Y. 1998).

As explained in *Timbers*, Section 506(b) "denies over secured creditors postpetition interest to the extent that such interest, when added to the principal amount of the claim, will exceed the value of the collateral."  *Timbers*, 484 U.S. at 372.  As a consequence, the allowed interest when added to the principal cannot exceed the value of the collateral.

Finally, as a general rule, "accrued interest under § 506 is not paid to an oversecured creditor until the plan's confirmation or its effective date, whichever is later."  *T-H New Orleans*, 116 F.3d at 799.  *See Milham*, 141 F.3d at 423 (noting that "[o]n the date of confirmation, the allowed claim of an oversecured creditor is augmented by the inclusion of section 506(b) pendency interest").

Section 552(b) and the Application of Post-Petition Payments  One benefit to a creditor with Section 552(b) rights is that post-petition rents may be "applied to satisfying the claim of the secured creditor ahead of the claims of the unsecured creditors."  *Timbers*, 484 U.S. at 374. *See 354 E. 66th St. Realty Corp.*, 177 B.R. at 781 (stating that Section 552(b) allows undersecured creditors the "right to apply the net post-petition rents to [their claims] to the exclusion of other creditors").  Thus, while Section 506(b) prohibits interest payments on the secured portion of an undersecured creditor's claim, courts consider "rent payments to be nothing more than advance payments on account of the creditor's secured claim resulting from a 'liquidation' of part of that creditor's collateral, *i.e.*, the rents themselves."  *In re Union Meeting Partners*, 178 B.R. 664, 676 (Bankr. E.D. Pa. 1995).  *See also Dewsnup v. Timm*, 502 U.S. 410, 417 (1992) (stating that "[a]ny increase over the judicially determined valuation during

bankruptcy rightly accrues to the benefit of the creditor, not to the benefit of the debtor and not to the benefit of other unsecured creditors").

At the same time, courts recognize "that money paid by the Debtor during the pendency of the case must be applied against some portion of [the creditor's] claim." *Gramercy Twins Assocs.*, 187 B.R. at 119. *See In re Oaks Partners, Ltd.*, 135 B.R. 440, 449 (Bankr. N.D. Ga. 1991) (stating that "a creditor is not entitled to be paid more than its claim, regardless of what kind or how much collateral secures the claim"); *354 E. 66th St. Realty Corp.*, 177 B.R. at 782. The only question is whether the payments should reduce the secured or the unsecured portion of the creditor's claim. *See, e.g.*, *Gramercy Twins Assocs.*, 187 B.R. at 119.

Many courts have found that payments from rents should not reduce the secured portion of a creditor's claim in the first instance, because of the creditor's separate security interest in those rents under Section 552(b). *See, e.g.*, *Gramercy Twins Assocs.*, 187 B.R. at 122; *Union Meeting Partners*, 178 B.R. at 674-76. As one court explained:

> [T]he post-petition payments are to be applied to principal, *after* taking into account that [the creditor's] secured claim includes the excess rents generated and paid to [the secured creditor] during the Chapter 11. 11 U.S.C. § 552(b). [The debtor's] position totally ignores [the creditor's] rights to these rents. The result is essentially a "wash" in that the additional collateral value represented by the excess rents is to be set-off by the fact that [the creditor] has already received them during the course of the Chapter 11. No further reduction of the [the creditor's] secured claim is appropriate.

*In re Flagler-at-First Assocs.*, 114 B.R. 297, 302 (Bankr. S.D. Fla. 1990). Viewed another way, when a creditor receives payments from rents, its collateral is returned to it. And courts recognize that if the debtor had not been able to use the rents, and instead the excess rents were segregated into a cash collateral account, the segregated rents would be added to the value of the creditor's secured claim. *See, e.g.*, *Flagler-at-First Assocs.*, 114 B.R. at 302.

But because Section 506(b) prohibits a creditor from receiving more than its allowed claim, the unsecured portion of the creditor's claim will be reduced by the amount of the payments. *See* 3 Collier on Bankruptcy ¶ 361.03[2][a], at 361-15 (noting that this is "the better" approach and "seems to have become the majority view"). As one court stated:

> The unsecured portion will be reduced because the overall claim of [the creditor] will be reduced by the payments made, since the creditor is not allowed in any circumstances to receive more than the amount of its total claim. When the secured portion (based on the value of the property) is subtracted from the reduced total claim, the unsecured portion that remains is correspondingly reduced by the amount of the payment.

*Gramercy Twins Assocs.*, 187 B.R. at 122 n.23. *See Bloomingdale Partners*, 155 B.R. at 975 (stating that "if, for purposes of confirmation, additional security accrues post-petition, then post-petition payments merely may be agreed prepayments of a secured claim, not unpermitted payments to an undersecured creditor").

This approach raises the question of how payments should be applied if the unsecured portion of a creditor's claim is paid in full during the pendency of the case. Under these circumstances, payments should be applied to the post-petition interest, fees, costs, and charges due under Section 506(b), and then to principal. As stated by one court, payments in excess of the unsecured claim should "be applied . . . to reduce the remaining secured claim and towards interest that now commences to accrue on the remainder of the defaulted claim." *354 E. 66th St. Realty Corp.*, 177 B.R. at 783. *See In re Vest Assocs.*, 217 B.R. 696, 705 (Bankr. S.D.N.Y. 1998) (stating that "[a]n oversecured creditor may allocate adequate protection payments to postpetition interest to the extent of its oversecurity; thereafter, a creditor must allocate the payments to reduce the principal portion of its claim"); 3 Collier on Bankruptcy ¶ 361.03[2][a], at 361-15 (noting that "when the lender's unsecured claim has been reduced to zero, rents should

be applied to postpetition interest, fees, costs and charges under section 506(b) and any excess returned to the estate").

<u>Bankruptcy Code Section 362(d)(3)</u>  Another consideration is whether payments made pursuant to Bankruptcy Code Section 362(d)(3), a provision that addresses stay relief in single asset real estate cases,[6] should be treated differently than other payments made by a debtor to a secured creditor during the pendency of the bankruptcy case.

Under Section 362(d)(3), a creditor is entitled to relief from the automatic stay in a single asset real estate case under certain circumstances, as follows:

> [Relief from the automatic stay shall be granted] unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later–
>
> (A)   the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or
>
> (B)   the debtor has commenced monthly payments that –
>
>> (i)   may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and
>>
>> (ii)   are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate . . . .

---

[6] Bankruptcy Code Section 101(51B) defines "single asset real estate" as:
> [R]eal property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto.

11 U.S.C. § 101(51B).

11 U.S.C. § 362(d)(3).  This means that, unless a single asset real estate debtor files an appropriate plan or commences making payments to the secured creditor within the statutory time period, or receives an extension of these time periods for cause, modification of the stay is warranted.  *See In re Crown Ohio Invs. LLC*, 2010 WL 935576, at *4 (Bankr. E.D.N.Y. Mar. 12, 2010).

Section 362(d)(3) was enacted in 1994 and later amended in 2005, and courts have described its legislative history as "meager."  *In re Heather Apartments Ltd. P'ship*, 366 B.R. 45, 49 (Bankr. D. Minn. 2007) (internal quotation marks omitted).  As one court explained:

> Section 362(d)(3) gives very special deference to the mortgagee of single-asset real estate, in an express entitlement to receive payments of contractual interest from the debtor once the first 90 days of the case have passed.  The only specific alternative available to the debtor-owner is to get the reorganization case pushed forward substantially by filing an arguably-confirmable plan within that first 90 days. . . . However, the terse extant history and the statute's own structure suggest that Congress was concerned about the relative unfairness of lengthy delay in Chapter 11 cases involving single-asset real estate projects, *In re LDN Corp.*, 191 B.R. [320,] 326 [(Bankr. E.D. Va. 1996)]; that one of its goals aims to expedite the proposal of meritorious plans of reorganization in such cases, *In re Kkemko, Inc.*, 181 B.R. [47,] 49 [(Bankr. S.D. Ohio 1995)]; and that, where the case does not early kick forward toward confirmation, a debtor must compensate its mortgagee for the time-value of the mortgagee's debt-investment, by the payment of interest at the original contractual rate.

*Heather Apartments*, 366 B.R. at 49-50.  As another court explained, in enacting Section 363(d)(3) "Congress was motivated by a desire to accord relief . . . where the owner of an encumbered building is attempting to avert loss of his building to his major lender who is grossly undersecured . . . ."  *Kkemko*, 181 B.R. at 51.  *See In re Erie Playce LLC*, 441 B.R. 905, 907 (Bankr. N.D. Ill. 2010) (noting that although "the legislative history . . . is scant, that which does exist . . . indicates that Congress desired to incentivize debtors to avoid delays in proposing meritorious plans of reorganization in single asset real estate cases").

Significantly, while Section 362(d)(3) requires payments to be "in an amount equal to interest," it does not entitle an undersecured creditor to post-petition interest.  *See Erie Playce*, 441 B.R. at 908 (explaining that "Section 362(d)(3)(B)(ii) states that the payment is 'in an amount equal to interest' not that it is an interest payment"); *In re Cambridge Woodbridge Apartments, L.L.C.*, 292 B.R. 832, 840 (Bankr. N.D. Ohio. 2003) (stating that "Section 362(d)(3) does not provide that the debtor must make interest payments"); 3 Collier on Bankruptcy ¶ 362.07[5], at 362-122 (stating that "[i]t should be noted that the payments are not necessarily payments of interest, but are in an amount 'equal to' interest at the then applicable nondefault contract rate of interest").

As Section 362(d)(3) does not entitle an undersecured creditor to post-petition interest, there is no practical difference between how payments from collateral in the form of post-petition rents under Section 362(d)(3) and adequate protection payments should be applied.  *See Erie Playce*, 441 B.R. at 908-09 (holding that an undersecured creditor is not entitled to post-petition interest and therefore payments made under Section 362(d)(3) must be applied to principal); 3 Collier on Bankruptcy ¶ 362.07[5], at 362-122 (explaining that the language of Section 362(d)(3)(B)(ii) "suggests that the payments may be applied to principal rather than interest, which, if the creditor is undersecured, would reduce the obligation with which the debtor must deal in a plan"); Kenneth N. Klee & Brendt C. Butler, *The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 – Business Bankruptcy Amendments*, 28 Cal. Bankr. J. 270, 310 (2006) (stating that the "[a]pplication of those monthly payments will depend on whether the creditor is over or undersecured" and when a creditor is undersecured "the payments should be applied to reduce principal").

40

In sum, whether payments to an undersecured creditor during the pendency of a case are made pursuant to Section 362(d)(3) or as adequate protection, they should be applied first to the principal amount of the debt.  If the payments eliminate the unsecured claim, then payments should be applied to the post-petition interest, fees, costs, and charges allowed under Section 506(b), and finally to principal.

*                    *                    *

The Debtor argues that its payments should first be applied to reduce the unsecured portion of the Lender's claim until that portion is reduced to zero.  When the Lender's claim is reduced to less than the value of the collateral, the Debtor may "determine to apply adequate protection payments to payments due under the Plan rather than toward any post-petition interest due to the Lender," and cites to authority for the proposition that a debtor may confirm a plan funded by rental income over the objection of a creditor.  Debtor's Br. ¶¶ 18; 21-27.

According to the Debtor, the Lender's unsecured claim is just over $1.9 million.  Based on that amount, the Debtor states that when it paid the Lender a total of $2,185,876 (including $278,940 in real estate taxes), as of June 29, 2010, the Lender's unsecured claim was paid in full.  The Debtor contends that the Lender became oversecured and entitled to post-petition interest at the non-default rate as of August 2010, and that the post-petition interest from August 2010 to December 31, 2011, totaled $2,290,395.  And the Debtor argues that applying payments of $4,676,284 to that interest and the Debtor's claim, the Lender's claim is $28,520,747 for confirmation purposes.

The Debtor also argues that the application of the payments in this way is required because "[a] creditor is not entitled to be paid more than its claim, regardless of what kind or

how much collateral secures the claim." Debtor's Br. ¶ 29. The Debtor also notes that outside

of bankruptcy, if the Lender took possession of the Rents, it would be required to apply them to

the debt. The Debtor contends that allowing the Lender to collect the Rents without applying

them to the debt would be tantamount to granting the Lender relief from the automatic stay, and

would result in a windfall to the Lender to the detriment of the Debtor's reorganization and its

other creditors. And the Debtor argues that under Section 506 and *Timbers*, an undersecured

creditor is not entitled to interest on its claim.

The Lender "does not dispute that the post-petition payments must be applied to amounts

due." Lender's Br. ¶ 24. But the Lender argues that the Court should not permit the Debtor to

"reduce the amount owed to the Lender by millions of dollars, thereby extinguishing the

Lender's voting rights as an unsecured creditor, and 'reorganize' at tremendous economic

benefit to itself and its members." Lender's Br. ¶ 2. And the Lender states that "[t]he Debtor's

attempt to apply a substantial amount of the post-petition payments to the Lender's pre-petition

claim is based on the Debtor's argument that post-petition interest did not start accruing until

August, 2010, more than fifteen months into the case." Lender's Br. ¶ 26. The Lender

challenges this contention on several grounds.

The Lender argues that "as of confirmation, the sources of repayment of [its] claim for

purposes of § 506(b) are the real property and the hypothetical rents that would have

accumulated in the Debtor's bank account if monthly payments had not been made . . . during

the case." Lender's Br. ¶ 27. Based on this argument, the Lender states that the total collateral

securing its claim is at least $33.6 million, or $4.6 million in payments plus the stipulated value

of the Property of $29 million. And the Lender argues that because its claim is between

$30,719,756.94 and $31,131,117.42, depending on whether its request for post-petition attorneys' fees is allowed, it is oversecured and entitled to post-petition interest from the petition date to confirmation under Section 506(b).

The Lender argues that the $4.6 million in payments is roughly equal to the non-default interest due under the Loan Documents. And the Lender states that its calculation of the value of the collateral should be adopted by the Court because adequate protection payments are normally made at the end of the case, and it should not be prejudiced because they were made during the case.

The Lender also disputes that the parties agreed in the Joint Statement that the combined value of the Property and the Rents is no more than $29 million. The Lender argues that if that were the parties' stipulation, then the value of the Property itself would be no more than $25 million, or $29 million less the $4.6 million in payments. And if this were the case, the Lender argues, it would still hold a substantial unsecured claim.

Alternatively, the Lender argues that it is entitled to post-petition interest under Section 362(d)(3). The Lender states that "[t]he structure of § 362(d)(3) makes clear that Congress wanted single-asset debtors to move promptly to confirmation or else compensate the secured creditor for the delay." Lender's Br. ¶ 31. As a result, the Lender argues, the Debtor was required under Section 362(d)(3) "to pay, and did in fact pay, post-petition interest to the Lender." Lender's Br. ¶ 32. And the Lender argues that "[i]n attempting to avoid post-petition interest, the Debtor seeks to turn § 362(d)(3) on its head." *Id.*

The Lender notes that "[i]f the Debtor had confirmed its plan within months of filing its petition, the number of post petition payments would have been limited" and the Lender would

43

still have an unsecured claim.  Lender's Br. ¶ 33.  The Lender argues that the Debtor's position

"would create a perverse incentive for a debtor to delay in order to gain an 'interest free'

forbearance period to the detriment of the mortgagee, which is directly contrary to the intended

purpose of" Section 363(d)(3).  Lender's Br. ¶ 32.  And the Lender contends that the Debtor's

position should be rejected to avoid this "dangerous precedent that would encourage delay in

single-asset reorganizations, a category of cases where Congress has specifically sought to

provide for extraordinary expedition."  Lender's Br. ¶ 33 (internal quotation marks omitted).

The Lender also argues that even if its right to post-petition interest began to accrue in

August 2010, that interest should accrue at the default rate provided for in the Loan Documents.

The Lender contends that under controlling authority, there is a presumption in favor of

awarding post-petition interest at the default rate.  The Lender states that if interest is calculated

at the default rate, then over $2 million in additional post-petition interest accrued from August

2010 to December 31, 2011.  And the Lender also argues that the Debtor incorrectly calculated

the non-default interest, because under the Loan Documents interest is calculated based on a

360-day year, and the Debtor used a 365-day year.

The Debtor responds that Section 506(b) prohibits an undersecured creditor from

receiving post-petition interest, and that there is no merit to the Lender's argument that the value

of the collateral should be calculated by adding the value of the Property to the amount of the

post-petition rents.  The Debtor notes that the parties stipulated in the Joint Statement "that the

value of the Collateral is and was throughout the Chapter 11 case and for confirmation purposes,

either equal to or less than $29,000,000."  Debtor's Reply ¶ 5.  The Debtor argues that

"collateral" includes both the Property and the Rents, and that the Lender is bound by this

stipulation.  Debtor's Reply ¶¶ 5-7.  And the Debtor argues that the Lender's contention that it is entitled to post-petition interest under Section 362(d)(3) is not supported by controlling or persuasive authority.

With respect to pendency interest, the Debtor argues that default interest is a penalty and is not justified in this case, and that under relevant authority there is no entitlement to default interest.  The Debtor contends that the Lender has not provided evidence that the default rate of interest is equivalent to actual loss, and allowing interest at the default rate would harm the other creditors and frustrate the Debtor's efforts to reorganize.  The Debtor also argues that default interest is not justified because the Lender's claim and the value of the Property are equivalent, and the Debtor is insolvent.  And the Debtor notes that the Lender did not request post-petition default interest in its proofs of claim.  Debtor's Reply ¶ 31.

At the outset, it is plain that the Debtor's post-petition payments from the Rents must be applied to the Lender's claim in some way.  As the majority of courts to consider these issues has concluded, Section 552(b) protects a creditor's separate security interest in rents and allows it to receive payments as adequate protection ahead of other creditors.  At the same time, a creditor cannot receive more than its allowed claim, and an undersecured creditor is not entitled to receive post-petition interest under Section 506(b).  As a consequence, the Debtor's payments from the Rents should be applied first to the unsecured portion of the Lender's claim until it is reduced to zero, and then to the post-petition interest, fees, costs, and charges allowed under Section 506(b), and finally to principal.  *See, e.g.*, *354 E. 66th St. Realty Corp.*, 177 B.R. at 783; 3 Collier on Bankruptcy ¶ 361.03[2][a], at 361-15.

For substantially the same reasons, the aggregate rents collected by the Debtor and paid

to the Lender cannot be added to the stipulated value of the collateral when determining the secured status of the Lender's claim under Section 506(a). The separate security interest in rents under Section 552(b) increases a creditor's secured claim by the amount of rental collateral held by the debtor. But here, when the Rents were paid to the Lender during the case, that additional security was extinguished. *See, e.g.*, *Gramercy Twins Assocs.*, 187 B.R. at 122 n.23.

Finally, payments made under Section 362(d)(3)(B)(ii) should be applied in the same way as adequate protection payments. This is because Section 362(d)(3) does not give an undersecured creditor the right to pendency interest. Instead, it requires that a single asset real estate debtor make payments to the secured creditor in an amount equal to the nondefault contract rate of interest. *See, e.g.*, *Erie Playce*, 441 B.R. at 908; *Cambridge Woodbridge Apartments*, 292 B.R. at 840. When a creditor receives payments under Section 362(d)(3), they must be applied to the creditor's claim in some way, and that application will depend on whether the creditor is over or undersecured. If a creditor is undersecured, payments should be applied first to the unsecured portion of the creditor's claim until it is reduced to zero. *See, e.g.*, *Erie Playce*, 441 B.R. at 908-09. And when a creditor is oversecured, payments should be applied to the post-petition interest, fees, costs, and charges allowed under Section 506(b), and then to principal.

This result is not altered by policy considerations. To be sure, courts have interpreted Section 362(d)(3) as expressing Congress' intent to expedite single asset real estate cases. Section 362(d)(3) accomplishes this goal by ensuring that if a debtor files a bankruptcy case and can neither propose a confirmable plan nor make payments in an amount equivalent to the non-default contract rate of interest, the automatic stay will be modified. But the Bankruptcy Code

46

does not place any cap or time limitation on those payments, or otherwise fix an outside date for the confirmation of a plan in a single asset real estate case.

The length of any case, single asset or not, depends on a variety of factors. A case may be resolved quickly where a debtor does not make the payments under Section 362(d)(3)(B)(ii), or where the creditor is grossly undersecured, or where other grounds warrant stay relief or dismissal, but this is not such a case. A case may also be resolved quickly when the parties reach a settlement or when the issues are straightforward and uncontested – but again, as the record shows, this is not such a case. To the contrary, this case has involved numerous disputes over complex matters, requiring notice, briefing, argument, evidentiary hearings, and decisions of the Court, as well as appeals to the District Court. And a related action against the Debtor's principals, in their capacity as guarantors, is also pending.

For these reasons, and based on the entire record, the Court finds that the Debtor's post-petition payments to the Lender should be applied first to the unsecured portion of its claim until it is reduced to zero, and then to the post-petition interest, fees, costs, and charges allowed under Section 506(b), and finally to principal. The extent of the interest, fees, costs, and charges that are due to the Lender under Section 506(b) remain to be determined by the Court on an appropriate record.

## Conclusion

For the reasons stated herein, and based on the entire record, the Court finds that the post-petition rental income generated by the Property is property of the estate and constitutes the Lender's cash collateral. The Court also finds that the Debtor's monthly payments to the Lender should be applied first to the unsecured portion of the Lender's claim until it is reduced to zero,

and then to post-petition interest, fees, costs, and charges allowed under Section 506(b).  To the extent that the payments exceed the allowed post-petition interest, they should then be applied to principal.  The extent of the interest, fees, costs, and charges that are due to the Lender under Section 506(b) remain to be determined by the Court on an appropriate record.  An order in conformity with this Memorandum Decision shall be entered simultaneously herewith.

Dated: Brooklyn, New York
      June *15*, 2012

                    *s/ Elizabeth S. Stong*
                    HONORABLE ELIZABETH S. STONG
                    UNITED STATES BANKRUPTCY JUDGE